UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/6/18

M.C.,

                        Plaintiff,

        -against-

COUNTY OF WESTCHESTER, NEW YORK;
WESTCHESTER MEDICAL CENTER; CHERYL
ARCHBALD; IRMA W. COSGRIFF; ADA HAUNG;
LAURAL SKELSON; GERMAINE JACQUETTE;
MIRAL A. SUBHANI; SHERLITA AMLER; JOHN
DOES #1-#3; and JANE DOES #1-#3,

                        Defendants.

No. 16-CV-3013 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

        Plaintiff M.C. bring this action against Defendants County of Westchester, New York;

Westchester Medical Center; Cheryl Archbald; Irma W. Cosgriff; Ada Huang; Laural Skelson;

Germaine Jacquette; Miral A. Subhani; and Sherlita Amler pursuant to 42 U.S.C. § 1983,

alleging violations of his First, Fourth, and Fourteenth Amendment rights. (ECF No. 39.)

Plaintiff additionally asserts a number of state tort claims, including claims for false

imprisonment, malicious prosecution, intentional infliction of emotional distress, and abuse of

process. (*Id.*)

        Presently before the Court is a motion to dismiss the Amended Complaint filed by

Westchester Medical Center ("WMC") and Miral A. Subhani (collectively, the "Medical

Defendants"), as well as a motion to dismiss the Amended Complaint filed by the County of

Westchester, Cherly Archbald, Irma Cosgriff, Ada Huang, Laural Skelson, Germain Jacquette,

and Sherlita Amler (collectively, the "County Defendants"). (ECF Nos. 59 & 65.) For the

following reasons, the Medical Defendants' motion is GRANTED in part and DENIED in part

and the County Defendants' motion is GRANTED in part and DENIED in part.

## BACKGROUND

### I. Factual Allegations

The following facts are derived from the Amended Complaint and are assumed to be true for the purposes of this opinion.

Plaintiff tested positive for tuberculosis ("TB") in early 2015. (Am. Compl. ¶ 20, ECF No. 39.) Once his diagnosis was confirmed, Plaintiff "made extensive efforts to identify a pulmonologist with [TB] expertise who could provide him with the necessary treatment." (*Id.* ¶ 21.) Indeed, from late January 2015 through late February 2015, Plaintiff contacted at least five different physicians in search of treatment. (*Id.*)

While Plaintiff was searching for a physician who could treat his TB, representatives of the Westchester County Department of Health ("WCDOH") contacted him. (*Id.* ¶22.) Among these WCDOH representatives was Defendant Germaine Jacquette, who made inquiries regarding Plaintiff's treatment. (*Id.*) Plaintiff expressed to the WCDOH that he had a strong preference to be treated by a private physician. (*Id.* ¶ 23.) Plaintiff further informed the WCDOH that he was actively seeking treatment, but was having trouble scheduling an appointment. (*Id.*) The WCDOH agreed that it would be appropriate for Plaintiff to be treated privately, so long as his treating physician remained in contact with the WCDOH. (*Id.* ¶ 24.) Defendant Jacquette even offered to assist Plaintiff in his search for a private physician. (*Id.*)

WCDOH representatives also asked Plaintiff to undergo a chest X-ray at Montefiore New Rochelle Hospital ("MNRH") and provide samples of his sputum for testing. (*Id.* ¶ 25.) Plaintiff complied with both of the WCDOH's requests. (*Id.*) While he was being examined at MNRH, hospital personnel initially offered to provide Plaintiff a prescription for TB

medication. (*Id.* ¶ 26.) However, after speaking with Defendant Huang, hospital personnel refused to provide such medication to Plaintiff, despite Plaintiff's numerous requests for medication. (*Id.* ¶ 27.) Instead, Defendant Jacquette suggested that Plaintiff be treated by Dr. Jeffrey Lederman, a Westchester-based pulmonologist. (*Id.*) Plaintiff agreed to see Dr. Lederman if he was unable to get an appointment with any of the doctors with whom he was attempting to arrange treatment, and an appointment was made for Plaintiff to see Dr. Lederman a few days later. (*Id.* ¶¶ 27–28.)

Before his scheduled appointment with Dr. Lederman, however, Plaintiff was able to secure an appointment with Dr. Joseph Cooke, a pulmonologist and the chairman at the Department of Medicine at New York-Presbyterian Queens Hospital. (*Id.* ¶ 29.) Because Plaintiff preferred to be treated by Dr. Cooke, he cancelled his previously scheduled appointment with Dr. Lederman. (*Id.* ¶ 30.) Plaintiff informed the WCDOH that his newly-obtained private doctor would keep the department apprised of Plaintiff's treatment. (*Id.* ¶ 31.)

Despite Plaintiff's successful efforts to obtain treatment for his TB, Defendant Irma W. Cosgriff submitted an Order to Show Cause, a verified petition, and supporting affidavits to the Westchester County Supreme Court seeking an order authorizing the involuntary confinement of Plaintiff for TB treatment on March 2, 2015. (*Id.* ¶ 32.) The petition was verified by Defendant Cheryl Archbald and the supporting affidavits were sworn by the Defendants Ada Huang and Laural Skelson. (*Id.*) These submissions were replete with falsehoods and material omissions regarding Plaintiff's efforts to obtain treatment. (*Id.* ¶ 33.) Defendant Archbald's petition falsely claimed that Plaintiff had "failed to comply with follow up medical appointments and to take any medications necessary for the treatment of his active TB and to prevent the spread of this contagious disease." (*Id.* ¶ 34.) Similarly, Defendant Haung's affidavit falsely claimed that

Plaintiff had been "unwilling to voluntarily comply with medical treatment of his TB," despite Plaintiff's diligent efforts to find a physician who would treat him. (*Id.* ¶ 35.) Defendant Skelson's sworn affidavit likewise erroneously claimed that Plaintiff "intentionally avoided treatment for his TB on several occasions." (*Id.* ¶ 36.) Not one of Defendants' submissions to the Westchester County Supreme Court made any mention of Plaintiff's diligent—and successful— efforts to obtain treatment from a private physician, or of WCDOH's agreement that treatment by a private physician would be appropriate. (*Id.* ¶¶ 35–38.)

The Westchester County Court signed the Order to Show Cause on March 3, 2015 and set a hearing for the very next day. (*Id.* ¶ 39.) Plaintiff never received any notice of the March 4 hearing and, thus, failed to appear. (*Id.* ¶¶ 40–41.) Based on the misrepresentations made by Defendants Cosgriff, Huang, Skelson, and Archbald, the Westchester County Court issued an Order authorizing Plaintiff's involuntary hospitalization for tuberculosis treatment on March 4, 2018. (*Id.* ¶ 42.)

Defendants failed to execute the Westchester Court's order for 51 days because they were aware that Plaintiff was receiving treatment on an out-patient basis from Dr. Cooke. (*Id.* ¶¶ 44– 45.) During that time, defendants had access to Plaintiff's pharmacy records, which reflected that Plaintiff was diligently filling his TB medication subscription. (*Id.* ¶ 48.) Further, Defendants were apprised of Plaintiff's compliance with his treatment by Dr. Cooke, who saw no reason to involuntarily confine Plaintiff to ensure his ongoing cooperation. (*Id.* ¶ 49.)

On April 23, 2015, Plaintiff was apprehended outside of the office building of a medical specialist with whom Plaintiff had an appointment, and was transported involuntarily to Westchester Medical Center ("WMC"). (*Id.* ¶ 50.) Defendants held Plaintiff in isolation at WMC against his will for nearly two months. (*Id.* ¶ 53.)

Shortly after the beginning of his confinement, Plaintiff filed his first notice of claim against Defendants. (*Id.* ¶ 56.) In retaliation, Defendants thereafter unnecessarily prolonged Plaintiff's confinement. (*Id.*) Indeed, Plaintiff alleges that the doctor who oversaw his treatment during his time at WMC, Defendant Miral Subhani, initially told him that he would be released if three consecutive rapid diagnostic tests for tuberculosis came back negative. (*Id.* ¶ 58.) Plaintiff complied with Defendant's request for samples, and all three test results were negative. (*Id.*) As a result, WMC removed Plaintiff's "contagious" designation and Defendant Subhani began to enter Plaintiff's room without a mask, and even remarked that she "was surprised Plaintiff was still at WMC." (*Id.*) A few days later, however, Defendant Subhani resumed wearing a mask when she interacted with Plaintiff. (*Id.* ¶ 59.) When Plaintiff inquired the reason for this change and why he had yet to be released, Defendant Subhani suggested that Plaintiff contact his attorney and stated, in sum and substance, "Now it's a lawyer's game." (*Id.* ¶ 60.)

On May 18, 2015, Defendant Cosgriff submitted an Order to Show Cause and swore a supporting affirmation seeking judicial authorization for Plaintiff's continued involuntary confinement. (*Id.* ¶ 61.) Defendants Huang and Amler submitted supporting affidavits, which again provided the Court with misleading information. (*Id.* ¶ 61–62.) Specifically, Defendants Huang and Amler both falsely informed the Court in their affidavits that Plaintiff could not be "relied upon to participate in and/or to complete an appropriate prescribed course of medication" for his tuberculosis. (*Id.* ¶ 63.) Both Defendants notably failed to include any information regarding Plaintiff's continued cooperation with his treatment and medication regimen or Plaintiff's negative TB test results. (*Id.* ¶ 64 –65.)

On June 18, 2015, the Westchester County Supreme Court held a second hearing concerning Plaintiff's medical commitment at WMC. (*Id.* ¶ 67.) Plaintiff was able to participate

at the hearing and was represented by counsel. (*Id.*) Under pressure from the court, Defendants agreed that Plaintiff could be released from isolation so long as he agreed to continue treatment on an outpatient basis. (*Id.* ¶ 68.) Defendants requested that Plaintiff sign an agreement releasing them from civil liability for his commitment as a condition of his release. (*Id.* ¶ 69.) However, Defendants abandoned that request under pressure from the Court. (*Id.*)

The Westchester County Supreme Court ordered that Plaintiff be released within 24 hours of the June 18th hearing. (*Id.* ¶ 70.) At approximately five in the afternoon on Friday, June 19, 2015, Defendant Jacquette instructed Plaintiff that he was required to sign a number of written agreements as a condition of his release, including a written acknowledgment that he had "active infectious tuberculosis." (*Id.*) Defendants insisted on Plaintiff signing such an acknowledgement despite the fact that Plaintiff had been on medication for more than three months, had repeatedly tested negative for tuberculosis, and was no longer contagious. (*Id.* ¶ 71.)

Defendants additionally asked Plaintiff to sign an agreement requiring him to remain in "isolation at home" indefinitely and refrain working, attending school, using public transportation, seeing visitors, or leaving Westchester County. (*Id.* ¶ 71.) None of these conditions, however, were ever approved or required by the Westchester County Supreme Court. (*Id.*)

Plaintiff refused to sign any agreement imposing conditions on his release. (*Id.* ¶ 72.) As a result, Plaintiff was held in WMC's custody until June 22, 2015—approximately sixty days after he was first committed. (*Id.* ¶ 72–73.)

## II. Procedural History

Plaintiff commenced the instant action by filing a Complaint on April 22, 2016, alleging violations of the First, Fourth, and Fourteenth Amendments as well as various state tort laws.

(ECF No. 1.) Plaintiff subsequently filed an Amended Complaint on October 14, 2016. (ECF No. 39.) The Medical Defendants filed the present motion to dismiss the Amended Complaint on December 27, 2016 (Med. Defs.' Mot. to Dismiss Am. Compl. ("Med. Defs.' Mot."), ECF No. 59.) Shortly thereafter, the County Defendants followed suit and also filed a motion to dismiss the Complaint on January 4, 2017. (County Defs.' Mot. to Dismiss Am. Compl. ("County Defs.' Mot."), ECF No. 65.)

## LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Ashcroft*, 556 U.S. at 678. (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss, a district court must "accept[ ] all factual claims in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (internal quotation marks omitted) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010)). However, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's [*f*]*actual* allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records,*

*LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555, 570). A complaint is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

Further, "[a] motion to dismiss under Rule 12(c) is governed by the same standard as a motion under Rule 12(b)(6)." *In re Ades & Berg Grp. Inv'rs*, 550 F.3d 240, 243 n.4 (2d Cir. 2008). As such, the district court accepts all allegations in the complaint as true, draws all reasonable inferences in the plaintiffs' favor, and properly dismisses the complaint when the allegations fail to raise an entitlement to relief above the speculative level. *Id.*; *see also Graziano v. Pataki*, 689 F.3d 110, 114 (2d Cir. 2012) ("To survive a Rule 12(c) motion, the complaint must contain sufficient factual matter to 'state a claim to relief that is plausible on its face.'" (quoting *Twombly*, 550 U.S. at 570)).

## DISCUSSION

Defendants move to dismiss the Amended Complaint, arguing that this court lacks subject matter jurisdiction to hear Plaintiff's claims, that they are entitled to either absolute or qualified immunity, and that Plaintiff has failed to adequately plead any constitutional violation or state tort claim. This Court considers each argument in turn.

### I.     County Defendants' Motion to Dismiss

#### A.  Subject Matter Jurisdiction

Defendants contend that this Court lacks jurisdiction to adjudicate Plaintiff's claims pursuant to the *Rooker–Feldman* doctrine. (County Defs.' Mot. at 18; Med. Defs.' Mot. at 10.) "Under the *Rooker–Feldman* doctrine, federal district courts lack jurisdiction over cases that essentially amount to appeals of state court judgments." *Vossbrinck v. Accredited Home Lenders, Inc.*, 773

F.3d 423, 426 (2d Cir. 2014). Accordingly, federal courts must abstain from considering claims when the following requirements are met:

> First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must complain[] of injuries caused by [a] state-court judgment[.] Third, the plaintiff must invit[e] district court review and rejection of [that] judgment[]. Fourth, the state-court judgment must have been rendered before the district court proceedings commenced—i.e., *Rooker–Feldman* has no application to federal-court suits proceeding in parallel with ongoing state-court litigation. The first and fourth of these requirements may be loosely termed procedural; the second and third may be termed substantive.

*Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 85 (2d Cir. 2005) (alterations in original) (internal quotation marks omitted)*; see also Vossbrick*, 773 F.3d at 426.

In the present action, the procedural requirements—factors one and four—are seemingly satisfied: Plaintiff was confined pursuant to a state court judgment that was rendered prior to the commencement of this federal action.[1] This Court finds, however, that the substantive factors are not similarly satisfied.

The third *Rooker–Feldman* factor requires that a Plaintiff "invite district court review and rejection" of a state court judgment. *Id.* Although Plaintiff's injuries relate to his civil commitment that was authorized by a state court judgment, Plaintiff does not challenge the legality of that judgment. Rather, Plaintiff challenges the independent and discretionary actions allegedly undertaken by the WCDOH, WMC, and their respective employees in falsely procuring and improperly executing that judgment. The Second Circuit has clearly found federal jurisdiction proper in such instances. *See Morrison v City of New York*, 591 F.3d 109, 115 (2d

---

[1] Plaintiff contends that because the Westchester County Supreme Court eventually authorized his release after the June 18, 2015 hearing, he did not "lose" the underlying state court action within the meaning of the doctrine. However, this Court is unpersuaded by Plaintiff's argument. The underlying "loss" for the purposes of the *Rooker–Feldman* analysis is the original state court order authorizing Plaintiff's confinement for thirty days. There is no indication that the state court's subsequent decision to release Plaintiff after he had been in WMC's custody for nearly sixty days in any way rejected the prior bases for authorizing Plaintiff's commitment. Rather, the state court simply found an extension of Plaintiff's commitment was not warranted. In any event, this Court finds the *Rooker–Feldman* doctrine inapplicable to the present action on different grounds.

Cir. 2010) (concluding that a suit was not barred by the *Rooker–Feldman* doctrine where there was "no basis for construing the complaint as an attack on the Family Court's order, rather than an attack on independent discretionary acts and decisions of the hospital staff that were not compelled by court order"); *Session v. Rodriguez*, 370 F. App'x 189, 192 (2d Cir. 2010) (summ. order) (finding that an arrestee's false arrest and malicious prosecution claims against a police officer were not barred by the *Rooker-Feldman* doctrine where plaintiff "did not invite district court review and rejection of the state court probable cause determination," but rather "invited scrutiny of the actions allegedly undertaken by [the police officer] in falsely obtaining that determination").

Plaintiff's eventual release from WMC's custody further underscores that the present action does not amount to an appeal of the state court's commitment order, and that this action may properly be heard in federal court. Because there is no longer any operative order authorizing Plaintiff's continued medical confinement, Plaintiff "plainly has not repaired to federal court to undo the [state court] judgment." *Green v. Mattingly*, 585 F.3d 97, 102 (2d Cir. 2009) (internal quotation marks omitted) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005)). Indeed, any challenge to the civil commitment order was likely rendered moot upon Plaintiff's release. Plaintiff, thus, has "neither a practical reason nor a legal basis to appeal the state-court decision that caused [his] alleged injuries"—confirming that his federal action does not invite district court review and rejection of that order. *Green*, 585 F.3d at 103.

Accordingly, this Court finds that Plaintiff's present claims are not barred under the *Rooker-Feldman* doctrine.

### B. Immunity

Because both absolute and qualified immunity are bars from suit rather than a limitation on

liability, the Court will next address the County Defendants' various claims to immunity.

### 1. *Absolute prosecutorial immunity*

Defendants contend that Defendant Cosgriff, the attorney who submitted the two orders to show cause to the state court—the first seeking an order authorizing Plaintiff's confinement for TB treatment and the second seeking an order continuing his confinement—is entitled to absolute prosecutorial immunity for her actions on behalf of the WCDOH and Westchester County. (County Def.'s Mot. at 9.)

It is well established that "[s]tate prosecutors are entitled to absolute immunity for [ ] conduct 'intimately associated with the judicial phase of the criminal process.'" *Hill v. City of New York*, 45 F.3d 653, 660–61 (2d Cir. 1995) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). "[A]bsolute immunity also extends to non-prosecutor officials when they are performing 'functions analogous to those of a prosecutor.'" *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (quoting *Butz v. Economou*, 438 U.S. 478, 515 (1978)). Accordingly, the Second Circuit has "extended absolute immunity to state and federal officials initiating noncriminal proceedings such as administrative proceedings and civil litigation." *Id.* at 127–128. (citing *Barrett v. United States*, 798 F.2d 565, 572 (2d Cir. 1986). In doing so, the Second Circuit reasoned that "[t]he controversial nature of the proceeding[s], the risk that a losing civil defendant will seek to retaliate by a suit attacking the propriety of the government attorney's conduct, and the existence of alternative safeguard against the attorney's misconduct . . . militate in favor of absolute immunity." *Barrett*, 798 F.2d at 572. Courts in this circuit have, thus, granted prosecutorial immunity to attorneys—like Defendant Cosgriff—who initiate civil proceedings in the government's interest. *See, e.g.*, *Cornejo*, 592 F.3d at 128 (recognizing that attorneys for a county department of social services who initiate and prosecute child protective orders are

entitled to absolute immunity); *Walden v. Wishengrad*, 745 F.2d 149, 152 (2d Cir. 1984) (same); *Roache v. Attorney Gen.'s Office*, No. 12-CV-1034 (LEK) (DEP), 2013 WL 5503151, at *13–14 (N.D.N.Y. Sept. 30, 2013) (finding that attorneys from the New York State Attorney General's Office who commenced a civil commitment proceeding pursuant to Mental Health Law Article 10 were entitled to prosecutorial immunity).

Plaintiff nevertheless contends that Defendant Cosgriff is not entitled to prosecutorial immunity because she "swore out a supporting affirmation seeking judicial authorization for Plaintiff's continued involuntary confinement" and submitted it to the state court. (Pl.'s Opp. to County Defs.' Mot. to Dismiss at 9, ECF No. 68.) Where a government attorney certifies the truth of facts in support of an application for a judicial order—Plaintiff argues—she takes on the role of a witness and prosecutorial immunity does not apply. *See Kalina v. Fletcher*, 522 U.S. 118, 130–131 (1997) (holding that the doctrine of absolute prosecutorial immunity did not apply where a prosecutor made false statements of fact in an affidavit supporting an application for an arrest warrant).

Plaintiff's argument, however, is inapposite. Although the Supreme Court recognized in *Kalina* that a government attorney was not entitled to prosecutorial immunity where she personally executed a sworn statement establishing the factual grounds for issuing an arrest warrant, similar facts do not exist in the present case. *Id.* Here, Plaintiff fails to point to even one false statement contained in Defendant Cosgriff's affidavit. Indeed, the only statement from the affidavit Plaintiff identifies is Defendant Cosgriff's characterization of the petition as "protecting the general public from the spread of TB until [Plaintiff] is declared not to be contagious by appropriate medical personnel and can be determined to reliably continue and complete appropriate medical evaluations, testing and treatment." (Pl.'s Opp. to County Defs.' Mot. to

Dismiss at 10.) While such a statement contextualizes the order sought by Defendants, it did not provide the court with any factual allegations or background. Rather, the Complaint only identifies factual information—or perhaps misinformation—contained in the supporting affidavits submitted by Defendants Amler and Huan (Compl. ¶ 61–65.) Defendant Cosgriff, thus, did not cross the line between advocate and witness.

Accordingly, because Defendant Cosgriff commenced the underlying proceeding to advance and protect the government's interest in public health and safety, this Court finds that she is entitled to prosecutorial immunity.

### 2. Absolute witness immunity

The County Defendants next contend that because the only allegations against Defendants Archbald, Huang, Skelson, and Amler, are that they provided affidavits and testimony expressing their medical opinions in the underlying public health proceeding, they are entitled to absolute witness immunity. This Court disagrees and finds that the aforementioned Defendants are not entitled to witness immunity.

Both trial and grand jury witnesses sued under § 1983 enjoy absolute immunity from any claim based on their testimony. *Rehberg v. Paul*, 566 U.S. 356, 367 (2012). The Supreme Court, however, has refused to extend absolute immunity to *all* activity conducted by a witness. *Id.* at 370 n.1. In particular, the Court has "afforded *only* qualified immunity to law enforcement officials who falsify affidavits and fabricate evidence concerning an unsolved crime." *Id.* (emphasis added) (internal citations omitted) (citing *Kalina*, 522 U.S. at 129–31; *Malley v. Briggs*, 475 U.S. 335, 340–345 (1986)). In such instances, the affiant is functionally a "complaining witness," to whom absolute witness immunity does not apply. *See Kalina*, 533 U.S. at 131; *Malley v. Briggs*, 475 U.S. 335, 340–341 (1986) ("[C]omplaining witnesses were

not absolutely immune at common law."); *see also Shabazz v. Kailer*, 201 F. Supp. 3d 386, 392–93 (S.D.N.Y. 2016) (finding absolute immunity inapplicable to an officer who acted akin to a complaining witness by signing a false affidavit and falsifying photographic evidence).

Here, the statute under which Plaintiff was committed—N.Y. Public Health Law § 2120—requires a "health officer" to file the complaint. Accordingly, Defendants Archbald, Huang, Skelson, and Amler verified the state court petition and submitted sworn affidavits attesting to Plaintiff's alleged failure to comply with any medical treatment for his TB. (Compl. ¶¶ 32–37, 61–66.) Like "complaining witnesses," Defendants thus "set the wheels of government in motion by instigating a legal action," *Wyatt v. Cole*, 504 U.S. 158, 164–65 (1992), and are not entitled to absolute witness immunity.

### 3. *Qualified Immunity*

Defendants Archbald, Huang, Skelson, Jacquette, Cosgriff, and Amler next contend that they acted in good faith at all times and are entitled to qualified immunity. This Court disagrees.

"Qualified immunity often shields government officials performing discretionary functions . . . from liability for civil damages." *Stein ex rel. Stein v. Barthelson*, 419 F. App'x 67, 69 (2d Cir. 2011) (internal quotations omitted). To determine whether qualified immunity bars suit against a government official, a court must engage in a two-step inquiry. *Id.* First, the court should "consider whether the facts alleged . . . demonstrate a violation of a constitutional right." *Id.* (internal quotation marks omitted). If a constitutional violation occurred, the court must then "consider whether the officials' actions violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (internal quotation marks omitted).

Because "[t]he defense of qualified immunity and the merits of the alleged constitutional

violations are intertwined," *Green*, 465 F.3d at 82, the Court now considers whether Defendants are immune from liability for each of Plaintiff's individual claims. The Court notes, however, that while a qualified immunity defense may be presented in a Rule 12(b)(6) motion, "the defense faces a formidable hurdle when advanced on such a motion and it usually not successful." *Field Day, LLC v. Cty. of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006) (internal quotation marks omitted) (quoting *McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir. 2004)).

### i. *Fourth Amendment Claims*

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. Accordingly, the Fourth Amendment "requires that an involuntary hospitalization may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard." *Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir. 1993) (internal quotations omitted). In the context of involuntary hospitalization for communicable diseases, N.Y. Public Health Law § 2120(3) requires a showing that the individual in question presents "a danger to others" in order to justify commitment.

Plaintiff alleges that he was handcuffed, shackled, and involuntarily transported to WMC—where he was held in isolation under the constant watch of an armed guard for nearly two months—despite posing no medical risk to others. (Compl. ¶¶ 51–53.) Such allegations, taken as true, undoubtedly establish a violation of the Fourth Amendment. *See Glass* 984 F.2d at 58 (applying the Fourth Amendment's protection from unreasonable seizures to involuntary hospitalizations); *see also Green v. City of New York*, 465 F.3d 65, 83 (2d Cir. 2006) ("[I]n order to constitutionally seize a person to transport him to a hospital, the person must be dangerous, presumably to himself or others . . . . [f]or a competent adult, dangerousness to oneself justifying

such a seizure does not include a refusal to accept medical treatment." (internal citation omitted)).

Nor does the state court's March 4th order authorizing Plaintiff's confinement alter this analysis—the County Defendants cannot base their immunity from suit on a state court order obtained through their own alleged misrepresentations. While a Fourth Amendment search or seizure pursuant to a finding of probable cause by a judicial officer is presumptively reasonable, such a presumption is overcome when the defendant "(1) knowingly and deliberately, or with a reckless disregard of the truth procured [the judicial finding], (2) based on false statements or material omissions, that (3) were necessary to the finding of probable cause." *Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017) (internal quotation marks omitted). That is precisely what Plaintiff alleges here—that the County Defendants knowingly made false representations to the court regarding his level contagiousness, without which the state court commitment order could not have been issued.

Furthermore, the order only authorized Plaintiff's confinement so long as Plaintiff was a "source of danger to others." N.Y. Pub. Health Law § 2120(3). Defendants' alleged execution and continued enforcement of the court order once they were aware that Plaintiff was no longer contagious would, thus, be unreasonable and constitute a violation of Plaintiff's Fourth Amendment rights.

Because Plaintiff's right to be free from unreasonable involuntary hospitalizations was "clearly established" at the time of Defendant's alleged actions, *see Green*, 465 F.3d at 83 (holding that it is "clearly established . . . that a competent adult [can] not be seized and transported for treatment unless she presented a danger to herself or others"), the Court finds that qualified immunity is not warranted at this juncture.

### ii. Fourteenth Amendment Due Process Claim

The Second Circuit has recognized that "[a]n involuntary commitment is a massive curtailment of liberty and it therefore cannot permissibly be accomplished without due process of law." *Oliver v. Robert L. Yeager Mental Health Ctr.*, 398 F.3d 183, 188 (2d Cir. 2005) (internal quotation marks omitted) (quoting *Rodriguez v. City of New York*, 72 F.3d 1051, 1061–62 (2d Cir. 1995)). "As a substantive matter, due process does not permit the involuntary hospitalization of a person who is not a danger to herself or to others." *Id.* Where, as here, Plaintiff alleges that he was receiving treatment and was no longer contagious, involuntary hospitalization runs counter to the substantive due process protections of the Fourteenth Amendment.

Having found that Plaintiff has sufficiently alleged a constitutional violation, the only remaining inquiry is whether Defendants violated a right that was clearly established at the time. Because there is clear Second Circuit law regarding substantive due process rights in the context of involuntary hospitalizations dating back decades, *see, e.g. Rodriguez*, 72 F.3d at 1062, this Court finds that Plaintiff's rights were clearly established. Thus, a finding that Defendants are entitled to qualified immunity, on the pleadings alone, is unwarranted. *See Timmins v. Toto*, 91 F. App'x 165, 167 (2d Cir. 2004) ("To overcome a defense of qualified immunity, the constitutional protection must have been clearly established under Supreme Court or Second Circuit law at the alleged time of injury." (citing *African Trade & Information Center, Inc. v. Abromaitis*, 294 F.3d 355, 360 (2d Cir. 2002)).

### iii. First Amendment Retaliation Claim

Plaintiff further alleges that the individual Defendants prolonged his involuntary commitment in retaliation for his decision to file a notice of claim, in violation of the First Amendment. (Am. Compl. ¶ 98.) A First Amendment retaliation claim requires a showing that

"(1) [plaintiff] has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." *Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).

Here, there is no doubt that Plaintiff has a protected interest in commencing a suit against public officials to protect his constitutional rights. *See Beechwood Restorative Care Center v. Leeds*, 436 F.3d 147, 152 (2d Cir. 2006) (recognizing plaintiff's numerous "complaints, protests, and lawsuits" against the New York State Department of Health as constitutionally protected speech).

Whether Plaintiff has adequately alleged a causal connection between his protected activity—filing a notice of claim—and the County Defendants' adverse action is a closer question. "A plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." *Smith v. Cty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015). However, the Second Circuit "has made clear that a plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link." *New Page at 63 Main, LLC v. Inc. Vill. of Sag Harbor*, No. 15-CV-2433 (ADS) (AKT), 2016 WL 8653493, at *9 (E.D.N.Y. Mar. 19, 2016) (internal quotation marks omitted), *aff'd,* 674 F. App'x 23 (2d Cir. 2016). In the present action, the only factual allegations from which a retaliatory motive may be inferred are Dr. Subhani's comment that Plaintiff's confinement was a "lawyer's game," and the Defendants' allegedly sudden shift in opinion regarding Plaintiff's eligibility for release. (*See* Am. Compl. ¶¶ 58–59.) While such allegations border on conclusory, the Court finds that they are sufficient to withstand a motion to dismiss. Taking Plaintiff's allegations as true, as the Court must at this juncture, Defendants exhibited a willingness to release Plaintiff up until they became aware of his notice of claim. (*Id.*

¶¶ 56–61.) That temporal connection, along with Defendants' alleged knowledge that Plaintiff's confinement was no longer medically justified, suffices to suggest a retaliatory motive.

Finally, Plaintiff has adequately alleged an injury for his retaliation claim. Notably, the Second Circuit has recognized that "[c]hilled speech is not the *sine qua non* of a First Amendment claim." *Dorsett*, 732 F.3d at 160. Rather, a Plaintiff "can show *either* that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm." *Id.* Thus, even if Plaintiff was not chilled from exercising his First Amendment right to pursue legal action against Defendants, his continued deprivation of liberty is a sufficiently adverse harm. *See id.* (recognizing additional scrutiny at a border crossing, revocation of a building permit, and refusal to enforce zoning laws as sufficient non-speech related harms).

Having found that Plaintiff has adequately alleged a violation of the First Amendment, the only remaining question is whether the right violated by Defendants was "clearly established." Plaintiff's First Amendment right to pursue legal action for his involuntary hospitalization was indisputably clearly established at the time of Defendants' allegedly retaliatory conduct. *See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002) ("The rights to complain to public officials and seek administrative and judicial relief from their actions are protected by the First Amendment."). Furthermore, the Second Circuit has long condemned deprivations of liberty undertaken in retaliation for the exercise of First Amendment rights. *See, e.g., Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) (finding that correction officer's alleged retaliatory filing of false misbehavior reports, resulting in prison inmate's "keeplock" confinement sufficient to state a First Amendment claim). Accordingly, based on Plaintiff's allegations, the Court refuses to find that Defendants

are entitled to qualified immunity at this juncture.

## II.     Medical Defendants' Motion to Dismiss

### A. Federal claims against WMC

Medical Defendants first contend that WMC is not a state actor and, thus, is not amenable to suit pursuant § 1983. *See Annis v. Cty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998) ("A § 1983 claim has two essential elements: (1) the defendant acted under the color of state law; and (2) as a result of the defendant's action, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges."). However, Defendants' argument is inapposite as Plaintiff does not raise any federal claims against WMC. (Pl.'s Opp. to Medical Defs.'s Mot. to Dismiss the Am. Compl. at 9.) Rather, the only claims asserted against WMC in the Amended Complaint are based on state law. As it is not being subjected to suit under §1983, WMC need not be a state actor.

### B. Federal claims against Dr. Subhani

Medical Defendants similarly contend that Dr. Subhani is not a state actor and, thus, cannot be sued pursuant to § 1983.

"Because constitutional protections constrain only government actors, a plaintiff pursuing a § 1983 claim must show in the first instance that the alleged constitutional violation constitutes state action." *Jackson v. Barden*, No. 12-CV-1069 (KPF), 2018 WL 340014, at *13 (S.D.N.Y. Jan. 8, 2018) (citing *Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012)). Private entities can be said to engage in state action where "(1) the State compelled the conduct, (2) there is a sufficiently close nexus between the State and the private conduct, or (3) the private conduct consisted of activity that has traditionally been the exclusive prerogative of the State." *Hogan v. A.O. Fox Mem'l Hosp.*, 346 F. App'x 627, 629 (2d Cir. 2009). "The fundamental question under

each test is whether the private entity's challenged actions are fairly attributable to the state." *McGugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014) (internal quotation marks omitted) (quoting *Fabrikant*, 691 F.3d at 207).

There is extensive case law applying each of these tests in the context of involuntary hospitalization by private health care providers in our Circuit. *See, e.g.*, *McGugan*, 752 F.3d at 229; *Hogan*, 346 F. App'x at 629; *Doe v. Rosenberg*, 166 F.3d 507 (2d Cir. 1999); *Jackson*, 2018 WL 340014, at *13; *Bryant v. Steele*, 93 F. Supp. 3d 80, 87 (E.D.N.Y. 2015). In the seminal case on this issue, *Doe v. Rosenberg*, the Second Circuit adopted the "comprehensive and scholarly" district court opinion by the Honorable Robert Sweet and held that private physicians who had civilly committed an individual pursuant to New York's Mental Hygiene Law did not satisfy any of the tests for state action. 166 F.3d at 507. The district court first reasoned that because the statute granted private physicians complete discretion in deciding whether to commit an individual, the state had neither "compelled nor encouraged" them to confine the defendant. *Rosenberg*, 996 F. Supp. 343, 349 (S.D.N.Y. 1998), *aff'd,* 166 F.3d 507 (2d Cir. 1999). Nor was there a sufficiently close nexus between the State and the private individuals to find that the state had "so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise." *Id.* at 352 (internal quotation marks omitted). Finally, after a thorough historical review, the district court determined that involuntary hospitalization has not traditionally been the exclusive prerogative of the state. *Id.* at 356.

There are, however, a number of factual distinctions between *Rosenberg* and the present action. Unlike the Mental Health statute in *Rosenberg*, N.Y. Public Health Law § 2120 does not provide private physicians broad discretion to make commitment decisions. Rather, § 2120

requires a "health officer"[2] to investigate persons afflicted with a communicable disease and, if necessary, commence an action to authorize their involuntary commitment. N.Y. Public Health Law § 2120(1)–(3). If "the complaint of the health officer is well-founded and [] the afflicted person is a source of danger to others," a court may commit the individual to any institution established for appropriate treatment, including private hospitals. (*Id.*) Once committed, an individual may only be released by the chief medical officer of the institution to which she has been committed. N.Y. Public Health Law § 2123(1).

This procedure markedly differs from that at issue in *Rosenberg*. Here, the private actors did not—and, indeed, could not have—initiated the commitment proceeding against Plaintiff. WMC and its employees did not exercise any independent discretion in the commitment decision. Instead, Plaintiff was merely placed at WMC by the court for his state-imposed hospitalization pursuant to the petition submitted by WCDOH employees. In analogous circumstances, courts in this Circuit have found a "sufficiently close nexus" between the State and private actors to state a claim pursuant to § 1983. *See, e.g., Bryant v. Steele*, 93 F. Supp. 3d 80, 93 (E.D.N.Y. 2015) (finding a sufficiently close nexus between private physicians and the State where the private actors could not have involuntarily committed the individual without the assistance of a state actor); *Tewksbury v. Dowling*, 169 F. Supp. 2d 103 (E.D.N.Y. 2001) (same).

This Court, however, need not linger on whether Dr. Subhani engaged in state action. As a treating physician employed by WMC, Dr. Subhani had no authority to commence or to conclude Plaintiff's commitment. As already discussed, Plaintiff was committed pursuant to the actions of Department of Health officials, and Dr. Subhani—who is not the chief medical officer

---

[2] A "health officer"—statutorily defined as an officer appointed by the commissioner of the Department of Health to assist with the proper performance of the powers and duties of the department—is undeniably a state actor. *See* N.Y. Public Health Law § 210

of WMC—could not personally end that confinement. *See* N.Y. Public Health Law § 2123(1). Because she played no role in initiating or prolonging Plaintiff's involuntary hospitalization, Dr. Subhani cannot be liable for the alleged constitutional violations. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (internal quotation marks omitted)). Accordingly, all federal claims against Dr. Subhani are dismissed.

### III.    State law claims

Defendants next argue that Plaintiff has failed to adequately allege any state tort claims stemming from his hospitalization. The Court now considers the adequacy of each of Plaintiff's state law claims in turn.

#### A.  False Imprisonment

"Under New York law, the elements of the tort of false imprisonment are: (1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *McGowan v. United States*, 825 F.3d 118, 126 (2d Cir. 2016).

Defendants do not contest that Plaintiff has adequately alleged the first three elements of a claim for false imprisonment. Rather, Defendants maintain that the "court order for [Plaintiff's] arrest and detention under the authority of the Public Health Law rendered plaintiff's confinement at WMC privileged." (Med. Defs.' Mot. at 13.) That state court order, however, only authorized Plaintiff's forced hospitalization while he was "a source of danger to others"— i.e., contagious. *See* N.Y. Public Health Law § 2120. Plaintiff alleges that WMC and its employees continued his confinement even once they became aware that he was no longer

contagious. If true, such actions were clearly beyond the scope of the court order and were, thus, not privileged. *See Morgan v. City of New York*, 822 N.Y.S.2d 567 (2d Dep't 2006) (recognizing that where a confinement decision requires independent medical judgment by a treating physician, "the determination to retain a patient is privileged only in the absence of negligence, or malpractice, in the exercise of that medical judgment"); *see also Miller v. State*, 961 N.Y.S.2d 359 (Ct. Cl. 2012) (recognizing that "while the existence of a facially valid order directing 'confinement' insulates those involved from liability for claims of false imprisonment with respect to the confinement directed in the [] order, it does not follow that imprisoning someone beyond his or her [maximum sentence expiration] date is privileged" (internal citations omitted)). Plaintiff has, therefore, adequately stated a claim for false imprisonment.

### B. Malicious Prosecution

"To establish a malicious prosecution claim under New York law, a plaintiff must demonstrate that [1] a proceeding was commenced or continued against him, [2] with malice and without probable cause, and [3] was terminated in his favor." *Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002). Defendants contend that Plaintiff has failed to make out such a claim because he "was not confined as a result of a criminal prosecution, there was probable cause to confine him, and there are no facts alleged that would constitute evidence of actual malice." (Med. Defs. Mot. at 13.) This Court disagrees.

First, a claim for malicious prosecution does not require that the underlying proceeding be criminal in nature. *See Serby v. Town of Hempstead*, 355 F. App'x 456, 459 (2d Cir. 2009) (suggesting that where a plaintiff can show "special injury," a civil proceeding may give rise to a cause of action for malicious prosecution); *347 Cent. Park Assocs., LLC v. Pine Top Assocs., LLC*, 41 N.Y.S.3d 99 (2d Dep't 2016), *leave to appeal denied*, 29 N.Y.3d 909 (2017) (outlining

the elements for "malicious prosecution of a civil action"); *see also Engel v. CBS, Inc.*, 93 N.Y.2d 195, 202 (1999) (recognizing that where an individual is subjected to interference with his or person or property through a civil action, a malicious prosecution claim may be sustained).

Second, Defendant's arguments that there was sufficient probable cause to confine Plaintiff and that there is no evidence of actual malice would be better suited for the summary judgment stage. Presently, at the motion to dismiss stage, the Court must take Plaintiff's factual allegations as true. *Lotes Co.*, 753 F.3d at 403. Plaintiff has sufficiently alleged that Defendants lacked probable cause to subject him to medical confinement. Further, as the Second Circuit has recognized, "lack of probable cause generally raises an inference of malice." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 536 (S.D.N.Y. 2015) (collecting cases). Accordingly, Plaintiff has sufficiently stated a claim for malicious prosecution.

### C. Intentional Infliction of Emotional Distress

The New York Court of Appeals has enumerated "four elements of a cause of action for intentional infliction of emotional distress: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Chanko v. Am. Broad. Companies Inc.*, 27 N.Y.3d 46, 56 (2016) (internal quotation marks omitted).

The Medical Defendants claim that Plaintiff failed to allege any facts which would support a claim for intentional infliction of emotional distress ("IIED"). (Med. Defs.' Mot. at 13.) This Court, however, need not dissect whether the facts at hand are sufficient to state an IIED claim. The Second Circuit has recognized that IIED "remains a highly disfavored [tort] under New York law." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 158 (2d Cir. 2014).

Indeed, "the New York Court of Appeals has questioned whether an intentional infliction claim can ever be brought where the challenged conduct falls well within the ambit of other traditional tort liability." *Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015) (internal quotation marks omitted) (quoting *Fischer v. Maloney*, 43 N.Y.2d 553, 557–58 (1978)). Since then, every New York Appellate Division court has answered that question in the negative: holding that an IIED claim should not be entertained where another tort claim is available. *Id.*; *see also Doin v. Dame*, 918 N.Y.S.2d 253, 254 (3d Dep't 2011); *Leonard v. Reinhardt*, 799 N.Y.S.2d 118, 119 (2d Dep't 2005); *Di Orio v. Utica City Sch. Dist. Bd. Of Educ.*, 758 N.Y.S.2d 743, 745 (4th Dep't 2003); *Hirschfeld v. Daily News, L.P.*, 703 N.Y.S.2d 558, 559 (1st Dep't 2000). Accordingly, the Second Circuit has held that "an intentional infliction tort may be invoked only as a last resort." *Salmon*, 802 F.3d at 256 (internal quotation marks omitted). Because Plaintiff has raised a number of other tort claims based on Defendants' actions—including a claim for false imprisonment—his IIED claim is dismissed as duplicative. *See Brandshaw v. City of New York*, 17-CV-1199 (AJP), 2017 WL 6060781, at *20 (S.D.N.Y. Dec. 7, 2017). In the event that his other tort claims fail, Plaintiff is granted leave to reassert the IIED claim.

### D. Abuse of Process

"To state a claim for abuse of process under New York law, a plaintiff must allege that a defendant '(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse o[r] justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of process." *Gilman v. Marsh & McLennan Companies, Inc.*, 868 F. Supp. 2d 118, 131 (S.D.N.Y. 2012) (quoting *Savino v. City of New York*, 331 F.3d 63, 70 (2d Cir. 2003)), *aff'd,* 654 F. App'x 16 (2d Cir. 2016)

The Medical Defendants argue—with absolutely no analysis—that Plaintiff has failed to provide any facts which would support a claim of abuse of process. This Court disagrees. Plaintiff has alleged that Defendants impermissibly prolonged his hospitalization pursuant to the Public Health Law to coerce him into signing an instrument releasing them from any liability relating to his confinement. (Am. Compl. ¶ 69.) Allegations that a defendant subjected an individual to involuntary hospitalization with no medical justification, and that such actions were done for inappropriate reasons—here, to retaliate against Plaintiff and prevent him from eventually seeking civil redress—are sufficient to survive a motion to dismiss. *See Matthews v. City of New York*, No. 15-CV-2311 (ALC), 2016 WL 5793414, at *7 (S.D.N.Y. Sept. 30, 2016) (finding an abuse of process claim was adequately pled where the plaintiff alleged she was confined and medicated despite the fact that she was not in need of psychiatric care because the defendants wanted to "fill beds" at the hospital).

### E.  Supplemental Jurisdiction

Finally, both sets of Defendants request that, in the event that all federal claims were dismissed, this Court decline to exercise supplemental jurisdiction over any remaining state law claims. (Med. Defs.' Mot. at 14; County Defs.' Mot. at 24.) However, "[the] argument that the Court should not exercise supplemental jurisdiction over the [state law] claims is moot in light of the fact that certain federal claims survive." *Guan N. v. NYC Dep't of Educ.*, No. 11-CV-4299 (AJN), 2014 WL 1275487, at *27 (S.D.N.Y. Mar. 24, 2014).

### CONCLUSION

For the foregoing reasons, the County Defendants' motion to dismiss the Amended Complaint is GRANTED in part and DENIED in part, and the Medical Defendants' motion to dismiss is also GRANTED in part and DENIED in part. All claims against Defendant Cosgriff

are dismissed, as are all federal claims against Defendant Dr. Subhani. Plaintiff's state law claim for Intentional Infliction of Emotional Distress is dismissed without prejudice. All other claims in this action remain.

The Court respectfully directs the Clerk to terminate the motions at ECF Nos. 59 and 65 and to terminate Defendant Cosgriff from this action. The parties shall appear for a conference on March 27, 2018 at 12:15PM. The parties are directed to complete the attached case management plan and submit a copy to chambers in advance of the scheduled conference. The remaining Defendants are further directed to file an answer to the Amended Complaint before March 27, 2018.

Dated:  March 06, 2018                    SO ORDERED:
        White Plains, New York

                                          NELSON S. ROMÁN
                                          United States District Judge

-------------------------------------------------------------x

                                 Plaintiff(s),       **CIVIL CASE DISCOVERY PLAN
AND SCHEDULING ORDER**

    - against -

                                 Defendant(s).     _____ CV _____ (NSR)

-------------------------------------------------------------x

      This Civil Case Discovery Plan and Scheduling Order is adopted, after consultation with counsel, pursuant to Fed. R. Civ. P. 16 and 26(f):

1.     All parties [consent] [do not consent] to conducting all further proceedings before a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c). The parties are free to withhold consent without adverse substantive consequences. (If all parties consent, the remaining paragraphs of this form need not be completed.)

2.     This case [is] [is not] to be tried to a jury.

3.     Joinder of additional parties must be accomplished by _____.

4.     Amended pleadings may be filed until _____. Any party seeking to amend its pleadings after that date must seek leave of court via motion.

5.     Interrogatories shall be served no later than _____, and responses thereto shall be served within thirty (30) days thereafter. The provisions of Local Civil Rule 33.3 [shall] [shall not] apply to this case.

6.     First request for production of documents, if any, shall be served no later than _____.

7.     Non-expert depositions shall be completed by _____.

    a.     Unless counsel agree otherwise or the Court so orders, depositions shall not be held until all parties have responded to any first requests for production of documents.

    b.     Depositions shall proceed concurrently.

    c.    Whenever possible, unless counsel agree otherwise or the Court so orders, non-party depositions shall follow party depositions.

8. Any further interrogatories, including expert interrogatories, shall be served no later than _____.

9. Requests to Admit, if any, shall be served no later than _____.

10. Expert reports shall be served no later than _____.

11. Rebuttal expert reports shall be served no later than _____.

12. Expert depositions shall be completed by _____.

13. Additional provisions agreed upon by counsel are attached hereto and made a part hereof.

14. **ALL DISCOVERY SHALL BE COMPLETED BY** _____.

15. Any motions shall be filed in accordance with the Court's Individual Practices.

16. This Civil Case Discovery Plan and Scheduling Order may not be changed without leave of Court (or the assigned Magistrate Judge acting under a specific order of reference).

17. The Magistrate Judge assigned to this case is the Hon. _____.

18. If, after entry of this Order, the parties consent to trial before a Magistrate Judge, the Magistrate Judge will schedule a date certain for trial and will, if necessary, amend this Order consistent therewith.

19. The next case management conference is scheduled for _____, at _____. (The Court will set this date at the initial conference.)


SO ORDERED.

Dated: White Plains, New York
    _____

                                _____
                                Nelson S. Román, U.S. District Judge