UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

M.C.,

                              Plaintiff,

        -against-

COUNTY OF WESTCHESTER, NEW YORK;
WESTCHESTER MEDICAL CENTER; CHERYL
ARCHBALD; IRMA W. COSGRIFF; ADA
HUANG; LAUREL SKELSON; GERMAINE
JACQUETTE; MIRAL A. SUBHANI; SHERLITA
AMLER; JOHN DOES #1 – #3, and JANE DOES
#1 – #3,

                              Defendants.

---

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: __12/18/2020____

16-cv-3013 (NSR)
**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge

        Before the Court are the motions for summary judgment filed by Defendants: (1) Sherlita

Amler, Cheryl Archbald, County of Westchester, New York, Ada Huang, Germaine Jacquette, and

Laural Skelson (collectively, the "WCDOH Defendants") (ECF No. 132); and (2) Westchester

Medical Center and Dr. Miral A. Subhani (collectively, the "WMC Defendants") (ECF No. 133).

For the reasons discussed below, Defendants' motions are GRANTED in part and DENIED in

part.

## BACKGROUND

        The Opinion assumes the parties' familiarity with the underlying claims, factual

allegations, and procedural history in this matter.  To briefly summarize, this action arises out of

Plaintiff's (referred to herein as "Plaintiff" or "M.C.") involuntary hospitalization at Westchester

Medical Center ("WMC") between April 23, 2015 and June 22, 2015.  Prior to his involuntary

hospitalization, Plaintiff had been diagnosed with Tuberculosis ("TB").  On March 4, 2015, after

WCDOH Defendants submitted affidavits and testified during a court proceeding (which Plaintiff

did not attend) before the Honorable Justice Lester Adler, New York Supreme Court Westchester County ("Justice Adler"), Justice Adler issued an Order and Decision authorizing Plaintiff's involuntary hospitalization pursuant to New York Public Health Laws § 2120 ("PHL § 2120") for a period of thirty (30) days after his initial arrest.  Plaintiff was apprehended on April 23, 2015. During the intervening time between Justice Adler's Order and Plaintiff's initial arrest, Plaintiff received outpatient treatment with a private physician, Dr. James Cooke, and experienced documented side effects often associated with the ingestion of anti-TB medication.  WCDOH Defendants, through correspondence with Dr. Cooke, became aware of certain developments in Plaintiff's treatment.

Following his arrest, Plaintiff objected to his continued hospitalization, largely complied with the medication regimen prescribed to him by the physicians at WMC, and provided some, but not all, of the sputum samples for testing that were requested by his physicians because he disputed the clinical necessity of additional testing.  During his detention, Plaintiff obtained legal counsel and filed a notice of claim indicating that he intended to bring a legal action against the WCDOH Defendants and WMC Defendants.  On May 18, 2015, after becoming aware of the notice of claim, and as the expiration of Justice Adler's March 4, 2015 order was approaching, WCDOH Defendants filed an order to show cause application to Justice Adler seeking an extension of Plaintiff's confinement for an additional 60 days.  Prior to the hearing on WCDOH Defendants' order to show cause application, Plaintiff's counsel and WCDOH Defendants' counsel agreed to several adjournments—first through June 2, 2015, and then through June 18, 2015—and agreed to Plaintiff's continued hospitalization at WMC until the hearing could be conducted.

At the June 18, 2015 hearing, the parties presented Justice Adler with an agreement to discharge Plaintiff subject to several conditions relating to Plaintiff's testing, clinical

improvement, and the provision of out-patient treatment for Plaintiff after his discharge from WMC, which was memorialized and so-ordered in Justice Adler's June 22, 2015 Decision and Order.  Plaintiff was ultimately discharged from WMC on June 22, 2015.

WCDOH Defendants have now moved for summary judgment on Plaintiff's federal claims of Section 1983 Fourth Amendment unlawful seizure, substantive due process violation, and First Amendment retaliation, and state law claims for false imprisonment, malicious prosecution, and malicious abuse of process.  (*See* WCDOH Defendants' Memorandum of Law in Support of the Motion for Summary Judgment ("WCDOH Moving Br.") (ECF No. 132-25); WCDOH Defendants' Memorandum of Law in Reply ("WCDOH Reply") (ECF No. 147).) WMC Defendants have moved for summary judgment as to the claims pending against them – *i.e.*, state law claims for false imprisonment, malicious prosecution, and malicious abuse of process.  (*See* WMC Defendants Memorandum of Law ("WMC Moving Br.") (ECF No. 135); WMC Defendants Reply Memorandum of Law in Further Support of Defendants' Summary Judgment Motion ("WMC Reply") (ECF No. 139).)  Plaintiff argues that genuine issues of material fact preclude summary judgment with respect to all causes of action.  (*See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment ("Pltf Opp.") (ECF No. 138).)  The motions were fully briefed as of December 6, 2019.  (*See* ECF Nos. 132 & 133.)

<u>**STANDARD ON A MOTION FOR SUMMARY JUDGMENT**</u>

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Rule 56(a), Fed. R. Civ. P.; *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113-14 (2d Cir. 2017).  "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Nick's Garage*, 875 F.3d at 113-14 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Whether particular facts are material

is determined by the substantive law. *Anderson*, 477 U.S. at 248. "The same standard applies whether summary judgment is granted on the merits or on an affirmative defense ...." *Giordano v. Market Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010).

The moving party bears the initial burden of informing the court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). He cannot "rely on conclusory allegations or unsubstantiated speculation' but 'must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact.'" *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 34 (2d Cir. 2015) (quotation marks and citation omitted). To defeat a motion for summary judgment, the nonmoving party must present such evidence as would allow a jury to find in his favor. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

## DISCUSSION

### I.        Plaintiff's Fourth Amendment Claim

"The Fourth Amendment prohibits 'unreasonable searches and seizures.'" *Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017) (quoting U.S. Const. amend. IV). "For a seizure to be reasonable, it must generally be supported by probable cause." *Mara v. Rilling*, 921 F.3d 48, 69 (2d Cir. 2019). "The Fourth Amendment's protection applies in civil context" and "applies to involuntary commitment." *Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir. 1993). Thus, "[t]he Fourth Amendment requires that an involuntary hospitalization may be made only upon probable cause,

that is, only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard." *Id.* (quotation omitted).[1]

"[P]robable cause is a fluid concept" that "turn[s] on the assessment of probabilities in particular factual contexts." *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)) (cleaned up). "The bulwark of Fourth Amendment protection, of course, is the Warrant Clause, requiring that, absent certain exceptions, police obtain a warrant from a neutral and disinterested magistrate...." *Franks v. Delaware*, 438 U.S. 154, 165, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Probable cause is "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability" that the person identified has committed the alleged crime or otherwise engaged in requisite conduct. *Gates*, 462 U.S. at 238.

Given the initial subjective standard, "a reviewing court generally accords substantial deference to the finding of an issuing judicial office that probable cause exists, limiting [the]

---

[1] The Court notes that the application of Fourth Amendment principles to a civil confinement such as the one here necessarily involves scrutinizing a judicial order that was issued under a more demanding standard than a traditional arrest warrant. PHL § 2120 authorizes involuntary detention upon a *clear and convincing* showing of dangerousness. *See Bradley v. Crowell*, 181 Misc. 2d 529, 530, 694 N.Y.S.2d 617, 618 (Sup. Ct. Suffolk County, 1999). By contrast, the Fourth Amendment demands a showing of *probable cause* to authorize a warrant. Accordingly, a Section 1983 Plaintiff's Fourth Amendment claim concerning involuntary confinement pursuant to PHL § 2120, such as the one asserted here, is seemingly undermined by a less burdensome showing—*i.e.*, dangerousness proven by a probable cause— than the initial application for involuntary confinement pursuant to PHL § 2120—*i.e.*, clear and convincing evidence of dangerousness. Conceivably, *Mayas* sought to adjust the Fourth Amendment standard—*i.e.*, require a showing of clear and convincing evidence to authorize seizure—in cases of involuntary confinement, such as the instant one, by instructing that "involuntary hospitalization may be made only . . . if there are reasonable grounds for believing that the person seized is subject to seizure under the *governing legal standard*." 984 F.2d at 58 (emphasis added). No party made such an argument, and, in any event, the Court is not confident that a seizure made upon probable cause, but not by clear and convincing evidence, is actionable under the Fourth Amendment.

inquiry to whether the office had a substantial basis for his determination." *United States v. Wey*, 256 F. Supp. 3d 355, 382 (S.D.N.Y. 2017) (citation and internal quotations omitted). Nonetheless, the presumption that a finding of probable cause by a judicial officer is reasonable can be overcome when the defendant "(1) knowingly and deliberately, or with a reckless disregard of the truth procured [the judicial finding], (2) based on false statements or material omissions, that (3) were necessary to the finding of probable cause." *Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017).

WCDOH Defendants asserts that, among other claims, Plaintiff's Fourth Amendment claim fails because Plaintiff's involuntary confinement was authorized by Justice Adler's March 4, 2015 Order and was supported by probable cause. Plaintiff counters that probable cause did not exist, and accordingly his claim survives, because: (1) materials submitted in support of the application to Justice Adler contained material misrepresentations and omissions; (2) even if probable cause existed as of the time of the March 4, 2015 order, such probable cause was stale as of April 23, 2015 (when he was ultimately detained); and (3) Plaintiff's continued confinement between May 23, 2015 and June 22, 2015 resulted from a separate order that only authorized his confinement due to material misstatements and omissions submitted in connection with that application.

### A.    Alleged Misstatements in, and Omissions From, the Record Before Justice Adler on March 4, 2015

"The materiality of a misrepresentation or an omission in this context is a mixed question of law and fact. The legal component depends on whether the information is relevant to the probable cause determination under controlling substantive law. But the weight that a neutral magistrate would likely have given such information is a question for the finder of fact, so that summary judgment is inappropriate in doubtful cases." *Velardi v. Walsh*, 40 F.3d 569, 574 (2d Cir. 1994) (citations omitted). "To determine whether a false statement was necessary to a finding

of probable cause, we consider a hypothetical corrected affidavit, produced by deleting any alleged misstatements from the original warrant affidavit and adding to it any relevant omitted information." *Ganek*, 874 F.3d at 82.  If there is no probable cause after the correction, then the "false statement was 'necessary' to secure issuance of the warrant." *Id.*   In performing the correction, the court must "examine all of the information the officers possessed when they applied for the arrest warrant." *Escalera v. Lunn*, 361 F.3d 737, 744 (2d Cir. 2004).

Plaintiff argues that his Fourth Amendment claim survives, despite the issuance of a warrant authorizing the involuntary seizure and confinement of Plaintiff, because the March 4 Order was allegedly procured through false representations.   Plaintiff identifies several misstatements including that Defendants submitted an affidavit asserting that: (1) M.C. had been educated about the need for DOT and knowingly disregarded that information; and (2) M.C. continuously attended work and school and thus exposed the public to infection.  (*See* Pltf Opp. at 23.)  Plaintiff also asserts that WCDOH Defendants' submissions omitted that Plaintiff had been in the process of seeking medical appointments for weeks and had repeatedly asked for medication. (*See id.*)

### 1.     Omissions Regarding Plaintiff's Attempts to Obtain Medical Treatment

In support of Westchester County Department of Health's ("WCDOH," used herein to refer to the agency as a whole rather than just the WCDOH Defendants) application for Plaintiff's involuntary confinement, WCDOH Defendants submitted affidavits that failed to include exculpatory information regarding Plaintiff's attempts to obtain medical attention.  Chiefly, Plaintiff observes that WCDOH Defendants failed to include that: (1) Plaintiff had asked both Montefiore New Rochelle Hospital and WCDOH personnel to prescribe or furnish anti-TB medications that he could self-administer; and (2) Plaintiff had been attempting to obtain medical appointments and expressed that he was having trouble getting an appointment.  (Pltf Opp. at 8-9

(citing Plaintiff's Counter-Statement of Facts Pursuant to Local Civil Rule 56.1 ("Pltf R.56.1 Statement") (ECF No. 146) ¶ 83.)  This information is relevant insofar as Plaintiff's attempts to obtain medical treatment are somewhat probative of whether or not he is dangerous to others – *e.g.*, if a person was not seeking to obtain medicine, then it is more likely than not that he or she would remain untreated for an infectious disease.

Plaintiff is correct that this information was omitted in Dr. Huang's affidavit.  But Dr. Huang's affidavit was not the only evidence before Justice Adler.  Instead, oral testimony before Justice Adler introduced established key facts relating to Plaintiff's attempts to obtain medical treatment.

At an evidentiary hearing held on March 4, 2015, in advance of Plaintiff's confinement, Mr. John Castanda, community health worker, testified that: (1) on February 19, 2015, he provided Plaintiff's uncle with an x-ray referral and requested a sputum sample to be obtained from Plaintiff; and (2) subsequently, on February 23, 2015, he received the sputum sample from the uncle and "the uncle advised me that he had taken his nephew for an x-ray and he asked for medication.  I told him I did not have any medications for him, that he would need to present the nephew to the clinic at some point so he can be evaluated and possibly given medication and follow up with the doctors."  (ECF No. 143-6 at Hearing Tr. 51:10-15.)  Likewise, Dr. Huang testified that Plaintiff (through his uncle) cancelled an appointment with Dr. Lederman, that had been arranged through the WCDOH, and informed Dr. Lederman that "he was going to see another doctor."  (ECF No. 143-6 at Hearing Tr. 30:19-31:4.)

Relatedly, Plaintiff takes issue with the Dr. Huang's testimony that WCDOH personnel "were able to get some specimens" of Plaintiff's sputum "when he showed up in a hospital emergency room here in Westchester" because it appears to diminish Plaintiff's role in voluntarily

complying with WCDOH's request to furnish the sputum samples.  (Pltf. Opp. at 9-10.)  However, even if this statement downplayed the degree to which Plaintiff cooperated with WCDOH Defendants, it is of no moment because the verified petition, other affidavits, and testimony presented to Justice Adler set forth in greater detail that Plaintiff had furnished the sputum samples and arrived at the hospital *at WCDOH's request—i.e.*, the exact information that Plaintiff claims was omitted.  (*See* ECF No. 132-18 (WCDOH Ex. P) at MSEK 0009 & MSEK 0016; ECF No. 143-6 at Hearing Tr. 30:19-31:4.)

Viewing the record in the light most favorable to Plaintiff, WCDOH's submissions to the Court, including oral testimony, disclosed that Plaintiff requested medication from WCDOH personnel, provided sputum samples and submitted to an x-ray examination at the request of the WCDOH, and averred that Plaintiff represented that he made an appointment, or intended to consult, with another doctor.  The only details omitted were that: (1) Plaintiff also requested medication from doctors at Montefiore New Rochelle Hospital and (2) Plaintiff inquired about appointments for a medical consultation with doctors unaffiliated with the WCDOH that he did not visit prior to the March 4, 2014 hearing.  It is doubtful that WCDOH Defendants were even aware of Plaintiff's nascent medical appointments at the time of the March 4, 2015 hearing besides being told by Dr. Lederman that Plaintiff advised him that he was going to see another doctor.  In any event, the Court will consider these additional details in conducting its corrected affidavit analysis in order to ascertain their materiality.

2.   *Misstatements Regarding Plaintiff's Continued Presence at School and Work*

Plaintiff contends that the verified petition and certain affidavits submitted in support of WCDOH's application for Plaintiff's involuntary hospitalization misrepresented the status of Plaintiff's continued attendance of work and school.  The verified petition asserts that "[u]pon

information and belief, [Plaintiff] continues to go to work and school." (ECF No. 132-18 (WCDOH Ex. P) at MSEK 0010.) Similarly, the affidavit of Dr. Archbald asserts that "[u]pon information and belief, [Plaintiff] continues to go to work and school via public transportation and thus directly exposing [sic] the general public as well as repeatedly exposing his household members, fellow co-workers and classmates to the TB disease." (ECF No. 132-18 (WCDOH Ex. P) at MSEK 0017.) The affidavit of Dr. Huang contains an identical statement. (ECF No. 132-18 (WCDOH Ex. P) at MSEK 0052.)

There appears to be a dispute as to when Plaintiff last attended school. Plaintiff contends that he last attended school sometime in late February based on testimony from Dr. Huang that she, in or around March 16, 2015, received an email indicating that Plaintiff had not been seen at Labor Technical College since late February 2015. (*See* Pltf R.56.1 Statement ¶ 77 (citing ECF No. 143-53 at Tr. 239:11-240:25).) However, WCDOH Defendants disputes this statement. (*See* WCDOH Defendants' Response to Plaintiff's Counter-Statement of Facts Pursuant to Local Civil Rule 56.1(b) ("WCDOH R.56.1 Resp.") (ECF No. 148) ¶ 77.) Testimony from Dr. Huang and Deputy Commissioner Archbald during the evidentiary hearing suggest that WCDOH had received information from Plaintiff's employer that he had attempted to attend classes on March 2, 2015. For example, Dr. Huang testified that "from the best of our information, we believe up until this Monday [*i.e.*, March 2, 2015] he continued to go to work and school, which is in New York City." (ECF No. 143-6 at Hearing Tr. 35:17-19.) Archbald also testified that he spoke with the Labor Technical College, advised them not to permit Plaintiff to physically attend classes, and was later advised that Plaintiff had attempted to attend classes at the Labor Technical College on March 2, 2015 at approximately 7:45 a.m. (ECF No. 143-6 at Hearing Tr. 46:6-18.) The testimony from Archbald is only somewhat different from Plaintiff's contention – *i.e.*, she testified that Plaintiff

last sought to attend school on March 2, whereas Plaintiff contends he last attended school in late February 2015.

There is also a dispute concerning when Plaintiff last attended work.  Plaintiff contends that he last attended work on February 21, 2015 based upon deposition testimony from Dr. Huang (*n.b.*, her deposition testimony reflected information obtained by WCDOH after the March 4, 2015 hearing).  (Pltf R.56.1 Statement ¶ 76.)  Archbald testified at the hearing that Plaintiff's employer disclosed to her during a phone call on February 27, 2015 that it had a record of Plaintiff attending work two weeks earlier [*i.e.*, approximately the week of February 9, 2015].  (ECF No. 143-6 at Hearing Tr. 45:16-18.)

In sum, the record before Justice Adler was inconsistent and the parties still do not agree as to Plaintiff's ongoing work and school attendance.  Nonetheless, the differences between the oral testimony at the evidentiary hearing and Plaintiff's current factual averments are marginal at best.  Written evidence introduced in advance of the hearing indicated that Plaintiff was attending work in an ongoing capacity.  By contrast, oral testimony before Justice Adler indicated that Plaintiff last attended work either on February 17, 2015 or sometime during the week of February 9, 2015.  Finally, Plaintiff now contends that he last attended work on February 21, 2015.  Likewise, written evidence indicated that Plaintiff was attending school in an ongoing capacity.  Oral testimony before Justice Adler indicated that he last attended school on March 2, 2015.  Whereas, Plaintiff now contends that he last attended school in or around late February.  Accordingly, the oral testimony at the March 4, 2015 hearing concerning the last date Plaintiff attended school and work was only different by a matter of a few days from Plaintiff's current factual averments.

Viewing the evidence in the light most favorable to Plaintiff, for the purposes of the corrected affidavit analysis, the Court will correct the evidence introduced to Justice Adler to reflect that Plaintiff last attended work on February 21, 2015 and last attended school sometime in late February 2015.

### 3. Misstatements Regarding Plaintiff's Knowledge of Directly Observed Therapy (DOT)

Plaintiff contends that Dr. Huang misrepresented Plaintiff's knowledge of Directly Observed Therapy ("DOT") – i.e., the daily monitored administration of anti-TB medication by a healthcare provider or public health employee to a person afflicted with TB in an in-patient or out-patient setting. Dr. Huang swore by affidavit that Plaintiff "has been notified of the importance to treat his tuberculosis (TB) and to submit to, and cooperate with, Direct Observed Therapy (DOT) and cooperate with taking all prescribed medications and all necessary medical evaluations and testing for the treatment and monitoring of his active TB. By correspondence from me, dated February 18, 2015, the Respondent was directed to report to the Westchester County Department of Health Chest Clinic located at 134 Court Street in the City of White Plains . . . The Respondent failed to comply with that directive." (ECF 143-5 at COW_00072.)

The alleged misrepresentation is at least somewhat relevant to the determination of Plaintiff's dangerousness. Pursuant to PHL § 2120, persons like Plaintiff can be involuntarily detained upon a finding that he or she is a "source of danger to others." Whether a person was apprised of the appropriate treatment is relevant to a determination of his or her dangerousness because it is probative of whether that person was knowingly increasing the risk that others would be exposed to infectious disease. For example, someone that is aware of the appropriate treatment and willingly defying the administration of that treatment evidences his or her indifference to the spread of infectious disease. By contrast, someone that is not aware of the appropriate treatment

and not acquiring that treatment does not evidence his or her indifference to the spread of infectious disease, and accordingly may be viewed as more capable of managing his or her illness responsibly and without the need for intrusive government intervention once he or she is informed of necessary precautions.

There is sufficient evidence for a jury to conclude that Dr. Huang's statement was either false or misleading. Dr. Huang was aware, or should have been aware, that efforts to directly communicate information relating to DOT to Plaintiff by WCDOH had been unsuccessful. Indeed, she testified at her deposition that as of February 2015 "all attempts [to try to talk to and visit Plaintiff] had not been successful." (ECF 143-53 at Tr. 90:13-22). Likewise, she stated that, as of the time the letter was sent to Plaintiff on February 18, 2015 "we had not really been able to have a conversation or what I call an interview of a person, which is our standard procedure when a case or somebody who is infected with TB first comes to us." (ECF 143-53 at Tr. 94:10-14). Similarly, Dr. Huang testified that, as of February 25, 2015, "[l]ike I keep saying, we had no contact with [Plaintiff] himself." (ECF No. 143-53, Tr. 151:8-10). Dr. Huang also testified, with respect to the state of knowledge regarding WCDOH's understanding of Plaintiff's treatment as of February 22, 2015, that "we had no communication with [Plaintiff]. This is also secondhand information. And so, we had no idea what [Plaintiff's] plans or intentions were. We couldn't speak to him. So we don't know what was communicated to him. We don't know what the plan was." (ECF No. 143-53 at Tr. 197:6-13). It is also undisputed that "[WCDOH employees] did not discuss DOT with M.C. during the only conversation M.C. had had with anyone from WCDOH [prior to the March 4, 2015 hearing]." (WCDOH R.56.1 Resp. ¶ 82.)

WCDOH Defendants assert, without citation, that Ms. Skelson and Dr. Jacquette "informed Plaintiff that it was imperative that he be evaluated by a doctor and begin receiving treatment and

taking medication, and that it was absolutely necessary that he communicate with WCDOH.  The protocols and requirements for DOT were laid out for Plaintiff."  (WCDOH Reply at 4.)  It is possible that WCDOH Defendants are referring to their attempts to serve Plaintiff with a Commissioner's Order at Plaintiff's designated residence (*i.e.*, his uncle's home) on February 25, 2015 and February 26, 2015. (Pltf R.56.1 Statement ¶ 60).  The Commissioner's Order directed Plaintiff to "follow a course of directly observed therapy and receive all necessary anti-tuberculosis medications prescribed by your treating physician" (ECF No. 132-17 at  6), and noted that Plaintiff's failure to adhere to medical advice to date "creates a substantial likelihood that without a complete detailed program and schedule of directly observed therapy, [Plaintiff] will continue to ignore medical advice and as a result you may spread the disease to others" (ECF No. 137-17 at 5).  The Commissioner's Order also contained a form document titled "Agreement For Directly Observed Therapy (DOT)" which, among other things, represented that "it has been explained to [the patient] that the most effective way to treat tuberculosis or tuberculosis infection is by providing medication to the patient and having a trained health care worker observe the ingestion of all oral medication administer injectables."  Plaintiff testified that he did not see that letter until sometime in 2016.  (ECF No. 143-52 at 91:24-92:5.)

At bottom, whether Plaintiff was informed of the necessity of DOT turns on the degree to which Plaintiff's testimony that he did not see the Commissioner's Order until 2016 is credible.  It is inappropriate for this Court to make a credibility determination at this stage.  Viewing the facts in the light most favorable to Plaintiff, there is at the very least a factual dispute as to whether Dr. Huang's statement—*i.e.*, that Plaintiff "has been notified of the importance to treat his tuberculosis (TB) and to submit to, and cooperate with, Direct Observed Therapy (DOT)"—was a

misrepresentation.  Accordingly, for the purposes of the corrected affidavit analysis, the Court will strike Dr. Huang's statement that Plaintiff was informed about the importance of DOT.

It is worth noting that, although the Court strikes Dr. Huang's testimony about Plaintiff's knowledge of DOT, the Court does not strike Dr. Huang's other testimony regarding the necessity of DOT as a clinical measure in general.  The fact that a person infected with TB is not receiving DOT is, separate and apart from that person's knowledge of DOT, probative (though not dispositive) of whether that person is a danger to others insofar as it indicates that the person may be less likely to completely recover from TB, and therefore remain infectious to others.  *See* Lawrence O. Gostin, *Tuberculosis and the Power of the State: Toward the Development of Rational Standards for the Review of Compulsory Public Health Powers*, 2 U. Chi. L. Sch. Roundtable 219, 270–71 (1995) ("As a general matter, it is easy to construct a formidable case favoring the state's imposition of DOT.  There exists considerable evidence that significant numbers of persons with tuberculosis do not complete the full course of their medication.  Studies have shown treatment 'noncompliance' rates ranging from twenty-two to fifty-five percent.  From a strict public health perspective, it does not matter whether the principal cause of treatment failure is based upon the inadequacy of health department services, the sheer difficulty of completing a complicated and extended treatment regime, social/psychological/cultural factors beyond the control of patients, or the willful non-compliance of patients. All of these factors probably contribute to treatment failure.").

### 4.    *Materiality of the Misstatements and Omissions*

In order to perform the corrected affidavit analysis, the Court asks whether Justice Adler could have found probable cause after misstatements are removed from the evidence presented to him.  As mentioned above, the Court will strike Dr. Huang's statement that Plaintiff was apprised of DOT and add into the record that Plaintiff last attended work and school on February 17, 2015

and late February, respectively.  Taken together the evidence presented to Justice Adler consisted

of, among other things, the following:

1)      Plaintiff was initially hospitalized at Jacobi Hospital in December 25, 2014 at which point a lung abnormality was detected, doctors sought to rule out the presence of TB through testing, and before the testing was completed Plaintiff left against medical advice.  (ECF No. 143-6 at Hearing Tr. 23:23-24; 27:4-9).

2)      The WCDOH became aware that samples from Plaintiff taken during his December 2014 hospitalization eventually tested positive for TB in or around January 28, 2015.  (ECF No. 143-6 at Hearing Tr. 55:6-56:6).

3)      Ms. Skelson spoke to Plaintiff over the phone on February 4, 2015, advised him that he needed to immediately see a doctor and start treatment, and that he risked exposing co-workers and family members to illness if he did not engage in those steps.  Plaintiff responded by advising her that he would consider coming in for treatment and further evaluation.  (ECF No. 143-6 at Hearing Tr. 58:13-59:11).

4)      Ms. Skelson spoke with Dr. Jenny—a doctor from Jacobi Hospital who was communicating with Plaintiff—and was informed that Dr. Jenny never physically saw Plaintiff but told him it was important for him to come in for an appointment, gave Plaintiff an appointment for February 2, 2015, and that Plaintiff was unable to show up to the appointment as a result of a snowstorm.  (ECF No. 143-6 at Heating Tr. 62:17-63:11).

5)      Between February 5, 2015 and February 13, 2015, WCDOH made at least 6 different attempts to contact Plaintiff and left several messages for him to contact WCDOH for evaluation and treatment and/or to send the name of a doctor that he would be contacting.  (ECF No. 132-18 at MSEK 0065; ECF No. 143-6 at Hearing Tr. 63:12-22).

6)      In light of difficulties communicating with Plaintiff, Ms. Skelson attempted to communicate with Plaintiff's uncle sometime after February 4.  (ECF No. 143-6 at Hearing Tr. 59:17-60:8.)

7)      Ms. Skelson affirmed that Plaintiff told her, at some point, that Plaintiff "works in New York City and travels there via public transportation."  (ECF No. 132-18 at MSEK 0065).  Separate from the hearing, Plaintiff confirmed during his deposition that he travelled via public transportation into New York during January 2015.  (ECF No. 132-3 at Tr. 80:22-82:14).  As discussed above, the corrected affidavit will reflect that Plaintiff last attended school in late February and last attended work on February 21, 2015.

8)      Dr. Huang testified that, on February 18, 2015, she sent a letter advising Plaintiff "that his tests were all positive for tuberculosis and we directed him to come to our TB clinic."  (ECF No. 143-6 at Hearing Tr. 27:10-12).  Based on her review

16

of Plaintiff's file, Plaintiff never came to the TB clinic.  (ECF No. 143-6 at Hearing Tr. 27:21-22).

9)  Dr. Huang testified that, "in order to ensure that people are adequately and completely treated, the standard of care is to observe every dose of every medication that everyone takes for TB until they have completed treatment." (ECF No. 143-6 at Hearing Tr. 25:16-19.)  In other words, she testified that DOT is that standard of care.

10) Dr. Huang testified that, Plaintiff's uncle "was advised that he [*i.e.*, Plaintiff] needed to get . . . medical care and treatment.  And he was given some options as to who he could go see for treatment.  And one of those people that he was given a referral to . . . was Dr. Lederman."  Subsequently, "the uncle contacted Dr. Lederman and informed him that [Plaintiff] would be coming to see him on February 26 at 4:00 p.m. in our TB chest clinic in the health department clinics." But that instead, on February 26, 2015, Dr. Lederman received a call saying that Plaintiff "was not going to be keeping his 4:00 o'clock appointment and that he was going to see another doctor."  (ECF No. 143-6 at Hearing Tr. 30:14-31:4.)

11) Dr. Huang further testified that "Dr. Lederman tried to contact both the [Plaintiff], actually, as well as the uncle . . . to find out, you know, information about who they were going to see, what the, you know, when the date of the appointment, without success."  (ECF No. 143-6 at Hearing Tr. 31:5-10).  Likewise, Dr. Huang testified that, WCDOH would likely have been notified if Plaintiff had gone to another doctor besides Dr. Lederman because, "you'd be hard pressed to find a physician who doesn't know that the health department needs to be notified [if that physician was treating a patient with TB]" and that failure to inform the WCDOH "would not be in compliance with New York State Public Health Law" and that between February 26 and March 4, the WCDOH was not notified by any physicians that Plaintiff had come in for treatment.  (ECF No. 143-6 at Hearing Tr. 31:18-32:19).

12) Dr. Huang, who was accepted as an expert on infectious diseases by Justice Adler, testified that, in her experience, Plaintiff poses a risk to himself and to others because "untreated tuberculosis is a lethal disease" and "there is also the issue of spreading the infection to other people that he's in contact with." (ECF No. 143-6 at Hearing Tr. 35:7-19).

13) Dr. Huang further testified that WCDOH had been informed by physicians at Sound Shore Hospital that "[t]he information was that [Plaintiff] was working up through February 17[, 2015]."  (ECF No. 143-6 at Hearing Tr. 35:21-25). However, in light of the corrected analysis, this statement should be adjusted to reflect that Plaintiff last attended work on February 21, 2015.  (Pltf's Counter R.56 Statement at ¶ 76; ECF No. 143-7, Pltf Ex. 13 at COW 00570).

14) Mr. John Castanda, community health worker, testified that: (1) on February 19, 2015, he provided Uncle with a x-ray referral and requested a sputum sample to

17

be obtained from Plaintiff; and (2) subsequently, on February 23, 2015, he received the sputum sample from the uncle and "the uncle advised me that he had taken his nephew [*i.e.*, Plaintiff] for an x-ray and he asked for medication.  I told him I did not have any medications for him, that he would need to present the nephew to the clinic at some point so he can be evaluated and possibly given medication and follow up with the doctors."  (ECF No. 143-6 at Hearing Tr. 51:10-15.)

15)     On February 22, 2015, "Plaintiff had a chest x-ray taken at Montefiore – New Rochelle Hospital which x-ray was also determined to be abnormal and consistent with pulmonary tuberculosis.  [Plaintiff] left Montefiore – New Rochelle Hospital prior to the completion of his medical evaluation."  (ECF No. 132-18 at MSEK 0009; MSEK 0016).

If presented with additional information that Plaintiff claims was omitted, the record would also contain the following:

1)     Sometime in February, Plaintiff attempted to obtain an appointment with Dr. Patel at Columbia Presbyterian and/or Dr. Wilson Quezada at Columbia Presbyterian, but could not get an appointment for approximately six weeks.

2)     Plaintiff expressed his preference to receive anti-TB medication that he could self-administer to certain employees of the WCDOH and physicians at the Montefiore New Rochelle Hospital.

3)     Plaintiff obtained an appointment with Dr. James Cooke for March 4, 2015 (*i.e.*, the same day as the hearing on WCDOH Defendants' petition for involuntary confinement).

4)     Plaintiff did not go to work after February 21, 2015 and last attended classes sometime in late February 2015.

Even viewing the facts in the light most favorable to Plaintiff, Plaintiff's undisputed conduct established a sufficient basis to support a probable cause finding (and even a finding by clear and convincing evidence) that Plaintiff was a source of danger to others.  Plaintiff was not responding to communications with the WCDOH.  Objectively assessed, this breakdown in communications was risky to the public insofar as it delayed the timely treatment of Plaintiff (and thus delayed the ability of medical professionals to mitigate his infectiousness to others), disrupted the ability of WCDOH to monitor Plaintiff's condition, engage in contact tracing, and otherwise

ascertain Plaintiff's whereabouts (and thus interfered with the ability of public health professionals to contain the spread of infectious disease).  Similarly, Justice Adler was apprised by a medical professional that DOT was the appropriate course of treatment to ensure the patient took every dose of medication.  Plaintiff's failure to communicate with WCDOH and failure to submit to DOT meant that the standard protocol for reducing potential externalities—*i.e.*, eliminating infectiousness in a verifiable manner—was not being put into place.

Plaintiff's decision to cancel his appointment with Dr. Lederman further delayed efforts to mitigate potential externalities arising from his continued infectiousness.  His decision to cancel that appointment did not occur in a vacuum.  It occurred after Plaintiff: (1) was apprised of a lung related abnormality in December 2014, (2) departed from a hospital attempting to diagnose his lung abnormality against medical advice, (3) received a positive TB diagnosis; (4) received (or ignored) communications including phone calls, text messages, and voice messages imploring him to obtain medical treatment immediately; (5) departed from another hospital that sought to conduct additional treatment; and (6) continued to work and attend school until February 21, 2015 and late February 2015, respectively.  In sum, as of March 4, 2015, Plaintiff was at the very least an individual with an infectious and deadly disease that was not currently being treated (much less treated through the use of DOT), who missed or rejected several opportunities for medical interventions, and remained potentially infectious to others.  These facts established probable cause that Plaintiff was a source of danger to others for the purposes of PHL § 2120.

There are certainly countervailing facts.  For example, Plaintiff provided sputum samples to the WCDOH, complied with having an x-ray examination in February, took steps to identify a pulmonologist, and stopped attending work and school as of late February.  And, as mentioned above, there is evidence suggesting that Plaintiff was not knowingly indifferent to the potential

risk of spreading TB that might have resulted from his failure to be treated by DOT.  Plaintiff's

failure to obtain treatment or maintain an open line of communication with the WCDOH may have

been the result of misunderstandings, missed communications, and his distrust of WCDOH.

Accepting all of that as true, the (corrected) evidence presented still established that Plaintiff had

an infectious disease, would not or could not maintain communications with the WCDOH,

remained untreated (much less in a verifiable manner through DOT), and thus, as a matter of law,

there was a sufficient basis to establish probable cause that he was dangerous to others

notwithstanding the fact that there might be a more innocent explanation for his noncompliance.

*See Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) ("[T]he fact that an innocent explanation

may be consistent with the facts alleged . . .  does not negate probable cause." (quotation marks

omitted)); *Vallen v. Connelly*, No. 99 CIV. 9947 (SAS), 2004 WL 555698, at *8 (S.D.N.Y. Mar.

19, 2004), aff'd, 185 F. App'x 22 (2d Cir. 2006) ("[A] showing of probable cause in the mental

health seizure context requires only a 'probability or substantial chance' of dangerous behavior,

not an actual showing of such behavior." (quoting *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th

Cir. 1997))).

Separately, Plaintiff "fails to make a substantial preliminary showing that the omission of

[certain information] was 'designed to mislead or was made in reckless disregard of whether it

would mislead.'"  *United States v. Calk*, No. 19 CR. 366 (LGS), 2020 WL 3577903, at *6

(S.D.N.Y. July 1, 2020) (quoting *United States v. Rajaratnam*, 719 F.3d 139, 155 (2d Cir. 2013).

Plaintiff has not established that Defendants were aware of his appointment with Dr. Cooke or his

inquiries into arranging treatment with Dr. Patel and Dr. Quezada prior to the March 4, 2015

hearing.  To the extent WCDOH Defendants were aware of his efforts to obtain medical treatment

they seemed to willingly provide that information to Justice Adler.  For example, Dr. Huang

testified that Plaintiff's uncle told Dr. Lederman that Plaintiff was going to see another doctor. Likewise, John Castanda testified to Justice Adler that he provided an x-ray referral to Plaintiff's uncle and that, subsequently, Plaintiff went to a hospital to get the x-ray examination and provided sputum samples. Similarly, even though certain affidavits seem to misrepresent that Plaintiff was actively attending school and work, testimony at the evidentiary hearing clarified that that the WCDOH believed that Plaintiff stopped attending school on March 2, 2015 and that the WCDOH instructed his employer and school to restrict his access to work and school. The WCDOH Defendants did not leave Justice Adler with the impression that Plaintiff was permitted to continue attending school and work. The WCDOH Defendants' oral clarification of misstatements in certain affidavit, belies the suggestion that they were attempting to mislead Justice Adler notwithstanding evidence in the drafting history of the affidavits demonstrating that WCDOH Defendants were uncertain that Plaintiff was actively attending school.

*      *      *

The Court finds that there were no material misstatements or omissions based on the corrected affidavit analysis, and that the March 4, 2015 Order was supported by probable cause. As discussed below, Plaintiff was seized 51 days after the issuance of this order, and his continued confinement was subject to the issuance of a separate order by Justice Adler. Accordingly, the Court must also address the validity of his seizure and continued confinement.

B.      *Whether Probable Cause Dissipated Between March 4, 2015 and April 23, 2015*

Plaintiff argues that, even if the March 4 Order was supported by probable cause, WCDOH Defendants are nonetheless liable for violating the Fourth Amendment because, by the time Plaintiff was arrested on April 23, 2015, "all of the important facts that led the court to issue its order had materially changed in the intervening period." (Pltf Opp. at 24.) Though not a model of clarity, WCDOH Defendants counter that certain undisputed facts upon which the March 4

21

Order was issued still existed and still established that Plaintiff was a danger to others even after the passage of 51 days.  (WCDOH Reply at 5.)

In support of his contention that probable cause can dissipate, Plaintiff cites cases holding that a *warrantless arrest* may lack probable cause where evidence obtained prior to the warrantless arrest vitiates probable cause.  *See* Pltf Opp. at 24 (citing *Nicholson v. City of Los Angeles*, 935 F.3d 685 (9th Cir. 2019); *Selvaggio v. Patterson*, 93 F. Supp. 3d 54 (E.D.N.Y. 2015)).  These cases are distinguishable from the instant matter because, unlike those cases, Plaintiff's seizure was pursuant to a court order rather than a warrantless arrest.

Plaintiff does not cite any cases regarding the effect of dissipation of probable cause on the legality of a search or seizure pursuant to a warrant.  Based on this Court's review, it is an issue of first impression whether probable cause can dissipate during the time between the issuance and execution of an order authorizing arrest pursuant to PHL § 2120.  The Second Circuit has addressed the related issue of whether probable cause can dissipate between the issuance and the execution of a search warrant.  In *United States v. Marin-Buitrago*, the Second Circuit observed that "[c]ertain restrictions are placed on the execution of search warrants to ensure that probable cause, as well as the veracity of the information in the affidavit, exists when the warrant is executed"— *e.g.*, the requirement that a search warrant be executed within ten days of its issuance pursuant to Fed. R. Crim. P. 41(c)—and concluded that "[u]nreasonable delay in the execution of a warrant that results in the lapse of probable cause will invalidate a warrant."  734 F.2d 889, 894 (2d Cir. 1984).[2]

---

[2] Although *Marin-Buitrago* concerned a search warrant, the Second Circuit subsequently stated, "We appear to have first discussed the effect of a dissipation of probable cause on the legality of a search **or seizure** in . . . *Marin-Buitrago* []."  *United States v. Pabon*, 871 F.3d 164, 175 (2d Cir. 2017) (emphasis added).

Generally, probable cause for arrest pursuant to a valid warrant does not dissipate with the passage of time because probable cause for arrest concerns a conclusion as to a past event—*e.g.*, the sale of narcotics by John Doe to an informant on March 29, 2012—which, if correct, will not change. *See* Gordon Mehler, John Gleeson, David C. James, and Alicyn L. Cooley, *Federal Criminal Practice: A Second Circuit Handbook* § 36-9 (20th ed. 2020) ("One difference between probable cause to arrest and probable cause to search is that once a crime has been committed, probable cause to arrest the perpetrator generally does not grow stale. Probable cause to search, however, frequently can become stale, given, for example, that warrants generally authorize searches for particular items that are not guaranteed to remain in the place to be searched."). Orders authorizing confinement pursuant to N.Y. Public Health Law § 2120 are based on the assessment of a present condition – *i.e.*, a finding that "the afflicted person is a source of danger to others[]." The present condition of being dangerous or afflicted can lapse with time—*e.g.*, if an infectious person's underlying condition is cured—or it may remain the same—*e.g.*, if the person remains infectious and unmonitored. In short, a determination of present tense dangerousness is not amenable to a bright line rule presupposing the lasting validity or ephemeral quality of probable cause.[3]

Accordingly, if the Court had to reach the issue, it would hold that where, as here, the complainant's confinement was pursuant to a judicial order, probable cause can dissipate if the

---

[3] PHL § 2120 does not set forth any time-based restriction on the execution of an order authorizing confinement of an individual adjudged to be infectious and dangerous. Nor would this Court seek to judicially invent a deadline for executing such an order akin to Fed. R. Crim. P. 41(c). In any event, such a rule would be improvident as certain infectious disease carriers may present a danger to the public for years and, under those circumstances, the lapse of time would not dissipate probable cause or invalidate the order authorizing confinement. The lodestone of probable cause at the time of seizure is a sufficient guide to public health officers seeking to ascertain whether, weeks after the issuance of a warrant, they are still entitled to seize an infectious disease carrier or whether an additional order is required.

delay in execution of a warrant results in the lapse of probable cause so as to invalidate the judicial order.  Of course, the lapse of time alone is likely insufficient to invalidate an order authorizing confinement pursuant to PHL § 2120.  Instead, the lapse of time must be accompanied by "a definite and material change . . . in the facts underlying the magistrate's determination of probable cause."  *Marin-Buitrago*, 734 F.2d at 894.  The proper analytical approach is to determine whether upon evaluating the subsequently obtained information "and the information in the affidavit [or record before Justice Adler] . . . probable cause continues to exist." *Id.*

Plaintiff argues that, between March 4, 2015 and April 23, 2015, Plaintiff's affirmative steps towards getting treatment vitiated the Court's probable cause determination.  In support of this position, Plaintiff notes that he attended appointments with Dr. Cooke on March 4, 2015, March 11, 2015, and March 25, 2015.  (Pltf. Opp. at 10-11; Pltf R.56.1 Statement ¶¶101 & 111.) He also claims that he filled a prescription for anti-TB medication obtained from Dr. Cooke on March 4, 2015, and subsequently refilled that prescription on March 27, 2015.  (Pltf Counter R.56.1 Statement ¶¶ 106 & 134.)  He was also directed to engage in self-isolation for a period of three weeks by Dr. Cooke.  (Pltf R.56.1 Statement ¶ 107.)  The WCDOH concedes that: (1) it learned on March 30, 2015, that Dr. Cooke was involved in treating Plaintiff (WCDOH R.56.1 Resp. ¶ 124); (2) it learned that Plaintiff had been seen by Dr. Cooke twice (WCDOH R.56.1 Resp. ¶ 125); and (3) it knew that Plaintiff had filled Dr. Cooke's prescriptions (WCDOH R.56.1 Resp. ¶ 133).  There is also no dispute that WCDOH learned by the week of March 16, 2015 that Plaintiff had not been seen at the Labor Technical College since late February 2015.  (WCDOH R.56.1 Resp. ¶ 109.)  Viewed in the light most favorable to Plaintiff, there is at least sufficient evidence upon which a jury could conclude that Plaintiff had obtained anti-TB medication, engaged in self-

isolation, ceased attending work and school, and attended several appointments with medical professionals including Dr. Cooke.

However, even viewing these facts in the light most positive to Plaintiff, the Court concludes that none of the developments in his treatment were definite and material to the probable cause determination of his dangerousness because Plaintiff's continued noncompliance with DOT and failures to communicate with the WCDOH still created unnecessary risks of spreading infectious disease to others.   As explained above, *inter alia*, Plaintiff's rejection of medical interventions, failure to engage in DOT, and failure to maintain communications with WCDOH furnished the probable cause basis for Justice Adler to conclude that Plaintiff was a source of the danger to the public in his March 4, 2015 Order authorizing Plaintiff's involuntary hospitalization. Many of these factors still persisted after March 4, 2015.

*First*, testing obtained by WCDOH after March 4, 2015 indicated that Plaintiff was still TB-positive.  (Plaintiff's Response to the WCDOH Defendants' Statement Pursuant to Local Civil Rule 56.1 ("Pltf R.56.1 Resp.") (ECF No. 144) ¶ 139.)  *Second*, Plaintiff's subsequent treatment with Dr. Cooke did not involve DOT, and thus this basis to conclude he was dangerous was still present.  (*See, e.g.*, Pltf R.56.1 Resp. ¶ 30; Pltf R. 56.1 Statement ¶ 105.)  *Third*, it remains undisputed that Plaintiff did not personally maintain communications with WCDOH and accordingly this indicium of dangerousness remained present.  *Fourth*, WCDOH did not obtain evidence after March 4, 2015 contradicting Plaintiff's historical rejection of medical interventions between December 2014 and March 4, 2015.  During that time, as discussed above, Plaintiff rejected medical interventions on several occasions, which is probative of whether Plaintiff could be trusted to manage his illness in concert with medical professionals going forward, and supported a probable cause determination that Plaintiff was still dangerous to others.  In sum, the

subsequently obtained information did not contradict bases upon which Plaintiff was deemed dangerous and, accordingly, there was no definite and material change in facts underlying Justice Adler's order authorizing Plaintiff's detention.

Even if Plaintiff's self-administration of anti-TB medication, failure to communicate with WCDOH, and historical rejection of medical interventions were insufficient independent bases to conclude Plaintiff was dangerous, the newly obtained information identified by Plaintiff is clearly distinguishable from the type of information that vitiated probable cause in cases cited by Plaintiff. In those cases, subsequently obtained information tended to disprove a historical event upon which probable cause was based.  For example, in *Nicholson*, 935 F.3d 685, the Ninth Circuit found that probable cause for an warrantless arrest had dissipated where, although the arresting officer initially thought he "saw a person . . . pointing . . . a blue steel handgun at another person" it soon became apparent that there was no basis for arrest because the suspects "had their school uniforms and backpacks," were "unarmed," and as the officer approached the suspects one was "spraying on cologne and [another] was donning his school uniform." *Id.* at 691.  In short, the subsequently obtained information cast serious doubt on whether the suspects ever possessed a firearm.

Likewise, in *People v. Quarles*, 88 Ill.App. 3d 340 (1980), law enforcement initially arrested a suspect for attempted burglary after receiving a telephone complaint.  Subsequently, the investigating detective learned from the owner of the apartment where the attempted burglary allegedly took place that: (1) the telephone complainants were not residents of the apartment; (2) the actual resident of the apartment had asked the owner if the suspect could reside in the apartment; (3) the landlord had approved the suspect's residence in the apartment; and (4) the owner inspected the apartment and found no sign of forced entry.  *Id.* at 341.  In short, the

subsequently obtained information cast serious doubt on whether the suspect ever attempted to burglarize the apartment.

In the instant case, the subsequently obtained information regarding Plaintiff's medical treatment between March 4, 2015 and April 23, 2015 did not contradict the historical record of Plaintiff's rejection of medical interventions prior to March 4, 2015, and was not conclusive as to his compliance with medical professionals after March 4, 2015.  While it is undisputed that the WCDOH was aware that Plaintiff attended several appointments with Dr. Cooke, obtained a prescription for anti-tuberculosis medication, refilled the prescription, and was instructed to engage in self-isolation, the WCDOH was not in receipt of information that proved Plaintiff's compliance with medical treatment—such as an account by Dr. Cooke that he, or another medical professional, personally administered the medication on daily basis.

On the one hand, exculpating evidence certainly existed of which WCDOH was aware. Contemporaneous records reflect that, as of April 2, 2015, WCDOH had been informed by Dr. Cooke that Plaintiff's uncle called to "complain that MC's urine has turned orange and also of some GI distress with TB medications"—both of which are potential side effects of anti-TB medications—and Dr. Cooke expressed that he "believe[d] that [Plaintiff's uncle and Plaintiff] want to be treated/take meds."  (ECF No. 143-32 at COW_00624.)  Dr. Jacquette reacted to this information by stating that "progress is being made." (ECF No. 143-32 at COW_00624.)  The WCDOH's account of this conversation is consistent with Dr. Cooke's contemporaneous notes from March 25, 2015, which reflect his assessment that Plaintiff was "[u]nder treatment [and that there was] no reason to believe [Plaintiff was] not taking medications."  (ECF No. 143-15 at MC000947.)  Additionally, a note from Dr. Cooke recounts that, on April 15, 2015, Dr. Cooke saw Plaintiff's uncle and received the message that Plaintiff "is taking his medications" is no

longer experiencing "GI distress," that he was told "no alcohol and no working," and that Plaintiff "is not with his girlfriend."  (ECF No. 143-40 at COW_0102.)

This account of Plaintiff's treatment is also consistent with certain deposition testimony of Dr. Cooke.  For example, he stated that he had written in his notes that there was no evidence Plaintiff is not taking his medications "because of my conversation with the uncle and [Plaintiff]. They were insistent that they were taking the medications, and [Plaintiff] volunteering that his urine was orange."  (ECF No. 143-58 at Tr. 67:2-5.)  Dr. Cooke also testified that it was his assessment that "[Plaintiff] was still under treatment for active tuberculosis" and that "[t]he medications seemed to be well tolerated at one month."  (ECF No. 143-58 at Tr. 67:22-68:3.)  Dr. Cooke also testified that he believed Plaintiff could comply with his medication regimen on an outpatient basis.  (ECF No. 143-58 at Tr. 130:3-5.)

However, unlike in *Nicholson* where law enforcement confirmed the suspects did not possess a firearm, the information WCDOH had available to it as of April 23, 2015 was equivocal about Plaintiff's adherence to treatment and isolation.  For one, the WCDOH was advised by law enforcement in New Jersey that, at least for a certain period of time after the March 4 Order went into effect, Plaintiff was residing with children in New Jersey and thus potentially exposing children to tuberculosis.  (ECF No. 143-53 at Tr. 243:24-244:23.)  Likewise, emails memorializing conversations between Dr. Huang and Dr. Cooke reflect that, as of April 2, 2015, Dr. Cooke had advised Dr. Huang that he "does not believe that MC is taking meds all at once as recommended due to GI distress."  (ECF No. 143-32 at COW_00624.)  Likewise, in that same communication, WCDOH was apprised that Plaintiff "requested that another MD than Dr. Cooke see MC about his TB."  (ECF No. 143-32 at COW_00625.)  As Plaintiff had previously cancelled appointments in order to consult with a different doctor, this appeared to be consistent with his prior conduct

28

considered by Justice Adler in granting the order authorizing Plaintiff's detention.  Later, records

from April 21, 2015 reflect that Dr. Huang had been advised by Dr. Cooke on April 14, 2015 that:

(1) "there was no way for [Dr. Cooke] to tell whether MC was taking his medications appropriately

or all at once, complying with isolation or consuming [alcohol]"; and (2) "he was not comfortable

continuing to care for MC if he did not return by 4/17/15 and said that if MC did not show up by

then, he felt that the best thing to do was for WDCH to proceed with the court-ordered detention."

(ECF No. 143-1 at COW_01100.)

   This account was largely consistent with the deposition testimony of Dr. Cooke who agreed

that, as of the middle of April 2015, he had "lost confidence in [his] ability to communicate with

[Plaintiff]."  Dr. Cooke also agreed with the statement that he "had no independent way of telling

if the plaintiff was being honest about taking his medications other than what he said."  (ECF No.

132-7 at Tr. 121:21-122:2.)  He also testified that he grew concerned about M.C.'s well-being as

a result of his failure to be able to reach him between March 26, 2015 and April 10, 2015.  (ECF

No. 143-58 at Tr. 80:7-12.)  His inability to communicate with Plaintiff prevented him from being

able to advise Plaintiff that "we may need more sputums or do more testing" and that "we had to

know whether or not he needed to be on more medication or not."  (ECF No. 143-58 at Tr. 71:15-

23.)  It is also consistent with notes taken by Dr. Cooke on March 26, 2015 stating that, after he

received testing indicating that Plaintiff was "[s]putum smear positive for AFC PCR," he

unsuccessfully "attempted to contact patient and the uncle" and accordingly he "will need to notify

the Westchester DOH to assure that [Plaintiff] is indeed taking his medication."  (ECF No. 143-

15 at MC000947.)

   The account is also consistent with the deposition testimony of WCDOH officials.  For

example, Dr. Huang testified that "I, myself, had direct conversations with Dr. Cooke.  And he

told me directly he had no idea whether or not [Plaintiff] was taking his medications or not.  He said he wrote a prescription for it, but that's all he could say."  (ECF No. 143-53 at Tr. 258:23-259:4.)  Likewise, Dr. Jacquette testified that she heard from Dr. Huang that Dr. Cooke had expressed doubts about whether Plaintiff was taking medication correctly.  (ECF No. 143-55 at Tr. 103:8-21.)

Plaintiff attempts to cast doubt upon any reservations that WCDOH may have had with respect to the effectiveness of Plaintiff's outpatient treatment by pointing to evidence generated *after* he was arrested on April 23, 2015.  For example, he cites to a timeline generated by Plaintiff's uncle stating that Plaintiff took all medications as directed.  (*See* ECF No. 143-41.)  Likewise, Plaintiff points to a letter from Dr. Cooke, written in September 2015 stating that "it is my opinion that [Plaintiff] was taking his anti-tuberculosis medication from the time I had originally prescribed it."  (ECF No. 143-38 at MC000523.)  But, even crediting this evidence, there is no basis for this Court to conclude that this information was known to WCDOH at the time of Plaintiff's arrest, and an evaluation of probable cause is limited to "the facts known by the arresting officer at the time of the arrest[.]"  *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013); *see also Warren v. Dyer*, 906 F.2d 70, 73 (2d Cir. 1990) (probable cause "encompasses only that information available to the arresting official prior to and including the point of seizure").

Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could find *ex post* that Plaintiff was in fact taking the medications he was prescribed, following Dr. Cooke's guidance to engage in isolation, and avoiding alcohol use.  But, viewing the facts in the light most favorable to Plaintiff, the totality of information available to WCDOH as of April 23, 2015 did not vitiate the existence of probable cause.  By contrast to the *Nicholson* and *Quarles*, there was no definite and material evidence known to WCDOH that cast serious doubt on whether Plaintiff

remained dangerous to the public.   In *Nicholson*, the basis for probable cause—*i.e.*, law enforcement witnessing possession of a gun—was directly controverted when law enforcement discovered that the suspects were unarmed.   Likewise, in *Quarles*, the basis for probable cause—*i.e.*, a telephone complaint that suspect had attempted a burglary at a particular address—was directly controverted when law enforcement was informed by the owner of the apartment that the suspect was in fact a resident of the apartment he was alleged to have attempted to burglarize and there was no signs of a break in.   Here, the communications from Dr. Cooke to WCDOH at the time of Plaintiff's arrest were, at best, ambivalent as to whether Plaintiff was adhering to the prescribed treatment plan.

At bottom, even in the light of the newly discovered information, the basis for probable cause persisted, and any reading of the inconsistent newly obtained information to invalidate the warrant would be hypertechnical and contrary to the Supreme Court's guidance that "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants."   *United States v. Ventresca*, 380 U.S. 102, 109, 85 S. Ct. 741, 746, 13 L. Ed. 2d 684 (1965).   Accordingly, the Court holds that the information available to the WCDOH between March 4, 2015 and April 23, 2015 did not vitiate probable cause or invalidate the order authorizing Plaintiff's detention.

*        *        *

The Court finds that probable cause supporting the March 4, 2015 Order had not dissipated by April 23, 2015.   Accordingly, the Court must also address the validity of Plaintiff's continued confinement after the March 4, 2015 Order expired on May 23, 2015.

C.   *Whether Plaintiff's Continued Detention After May 23, 2015 Was Procured Through False Representations to Justice Adler*

Plaintiff argues that, irrespective of whether Plaintiff's initial confinement was privileged and supported by probable cause, as this Court has held, there is still a freestanding basis for Fourth Amendment liability because the WCDOH Defendants fabricated evidence in their application to extend Plaintiff's confinement past May 23, 2015.  (Pltf. Opp. At 26.)  Plaintiff's cites several cases for this position which the Court examines below.

In *Garnett v. Undercover Officer C0039*, the Second Circuit held that a Section 1983 plaintiff may sue for denial of the right to a fair trial based on a police officer's fabrication of information, including when the information fabricated is the officer's own account of his or her observations of alleged criminal activity, which he or she then conveys to a prosecutor.  838 F.3d 265, 274 (2d Cir. 2016).  This stems from its previous holding "that a privileged arrest is insufficient to negate the fifth element of a fair trial claim when an officer falsifies information 'likely to influence a jury's decision and forwards that information to prosecutors.'"  *Id.* at 277 (citing *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)).  Accordingly, *Garnett* is not concerned with the existence of probable cause, nor the contours of a Section 1983 unlawful seizure claim, and instead goes to whether false representations can sustain a Section 1983 fair trial claim.

*Russo v. City of Bridgeport*, 479 F.3d 196 (2d Cir. 2007) is more relevant to a Fourth Amendment violation as it articulates the standards for asserting a Section 1983 claim for unreasonably prolonged detention in violation of the Fourth Amendment.  An accused may recover for an unlawfully sustained detention if he establishes that "(i) he was wrongfully incarcerated for an unreasonable length of time; (ii) the defendant-officer, by expending reasonable cost and effort, could have conclusively established the plaintiff's innocence; (iii) the defendant-officer failed to

32

do so; and (iv) the defendant-officer acted with a culpable mental state—*i.e.*, with intent to unlawfully detain the plaintiff or deliberate indifference to his constitutional rights." *Thompson v. City of New York*, 603 F. Supp. 2d 650, 656 (S.D.N.Y. 2009). *Russo* indicated that the touchstone is whether the defendants' actions were objectively reasonable under the circumstances, including, *inter alia*, (1) the length of time of [the] wrongful incarceration, (2) the ease with which the evidence exculpating [the plaintiff] . . . could have been checked, and (3) the alleged intentionality of [the defendants'] behavior." *Id.*

As a preliminary matter, *Russo v. City of Bridgeport*, is of dubious applicability to the instant case because there is no allegation here that the WCDOH Defendants failed to investigate potential sources of exculpatory evidence. Plaintiff appears to contend that *Russo* applies, or can be extended to apply, to claims for prolonged incarceration where, even though no exculpatory evidence was left uninvestigated, the detention was extended through, in part, the falsification of evidence submitted to a court. District courts have been reluctant to extend *Russo* beyond the factual scenario presented in that case. *See, e.g.*, *Jackson v. City of New York*, 29 F. Supp. 3d 161, 179 (E.D.N.Y. 2014) ("*Russo* has been narrowly construed to involve situations where a law enforcement official has mishandled or suppressed readily available exculpatory evidence, which resulted in the plaintiff's unreasonably long incarceration.").

Instead, ordinarily, a Fourth Amendment claim regarding the falsification of evidence within an affidavit supporting an arrest warrant would be assessed through the corrected affidavit analysis that the Court employed above. The corrected affidavit test cannot be applied here because, as discussed in more detail below, Justice Adler did not evaluate the order to show cause application or issue an order extending Plaintiff's confinement based upon the evidence presented therein. Instead, Plaintiff and WCDOH Defendants entered into an agreement to adjourn the order

to show cause hearing and Plaintiff consented to his continued confinement until that hearing. Thus, this Court is not faced with a judicial determination of probable cause and cannot assess whether that judicial determination would have been different had allegedly false information been excluded.

Even assuming *Russo* applies to cases that do not involve the failure to investigate exculpatory evidence, that claim would fail because WCDOH Defendants' order to show cause application and supporting affidavits were not the proximate cause of his confinement. *Lundt v. City of New York*, No. 12 CIV. 1737 DLC, 2013 WL 5298458, at *4 (S.D.N.Y. Sept. 20, 2013) ("To be actionable, any violation of constitutional rights must proximately cause the Section 1983 injury."). Though not a model of clarity, Justice Adler's March 4 Order appears to envision that Plaintiff's involuntary hospitalization was only initially authorized for 30 days after his seizure, *i.e.*, through May 23, 2015.  (*See* ECF 132-19 at 0042 ("ORDERED, that in the event of further proceedings within 30 days of his isolation, Respondent is not required to appear in person on the return date but may appear by videoconferencing and/or telephone conferencing and/or appear by legal counsel")).  Given this time-limited detention, Plaintiff argues that his continued detention would have lacked judicial authorization after May 23, 2015, and should have ceased, absent Defendants Amler and Huang submitting falsified information in WCDOH's order to show cause application and supporting affidavits seeking Plaintiff's continued confinement for an additional 60 days.  (Pltf Opp. at 26.)  This argument would be more persuasive if Justice Adler had ordered Plaintiff's continued confinement based upon the order to show cause and supporting affidavits submitted by the Defendants.  He did not.

Instead, Plaintiff's continued confinement was authorized by Justice Adler based upon an agreement between Plaintiff's counsel and WCDOH's legal counsel.  Justice Adler's Decision and

Order dated June 22, 2015 states "[t]he parties by and through their legal representatives . . . agreed and the Court so ordered that a hearing on the Order to Show Cause would be held on June 2, 2015 and pending that hearing, **it was agreed by the parties** and so ordered by the Court that the March 3, 2014 Order would be extended up to and including June 2, 2015 and **[Plaintiff's] isolation at the Westchester Medical Center would continue** until the Court renders a Decision after the completion of the June 2, 2015 hearing."   (ECF No. 142-25 at COW_01498 (emphasis added).)   The June 22 Decision and Order also states that "**The parties by and through their legal representatives further agreed** and the Court so ordered an adjournment of the June 2, 2015 hearing to June 18, 2015, and the parties agreed and the Court so ordered that the March 4, 2015 Order would be extended and **[Plaintiff's] isolation at the Westchester Medical Center would continue until the Court renders a Decision after the completion of the June 18, 2015 hearing**."   (ECF No. 143-25 at COW_01498 (emphasis added).)   Further, during his deposition, Plaintiff agreed with the statement that he "consented to [his] continued confinement at Westchester Medical Center between May 19, 2015, and June 18th, 2015."  (ECF No. 143-52 at Tr. 183:6–24.)

Plaintiff does not reasonably dispute that he consented to his continued confinement at WMC until June 18, 2015.   He argues instead that "Plaintiff's attorney consented to an adjournment of the proceedings in order to gather evidence and witnesses to present to the Court to assure M.C.'s release" and that "Plaintiff at no time agreed that his admission to WMC was necessary or appropriate."   (Pltf Resp. to WMC R.56.1 Statement at ¶ 14.)   But Plaintiff's reservation of rights to dispute the medical necessity of his *initial* admission is not relevant to whether his continued confinement was proximately caused by the submission of allegedly misleading affidavits in support of an application for his continued confinement.   The parties' agreement to continue Plaintiff's confinement is a superseding cause of Plaintiff's confinement,

and accordingly Plaintiff cannot sustain a Section 1983 claim for unreasonably prolonged detention based upon the WCDOH Defendants' application to extend his detention.

Accordingly, the Court finds that Plaintiff's continued confinement after the expiration of the March 4, 2015 Order was not caused by WCDOH's submission of any information because: (1) the superseding cause of Plaintiff's detention was his consent to continued confinement and (2) the falsification of information submitted in an affidavit that was not considered by a court does not give rise to a *Russo* claim for prolonged detention.

*      *      *

The Court holds that Plaintiff's confinement was supported by probable cause because: (1) the March 4, 2015 Order authorizing Plaintiff's detention was still supported by probable cause after misleading affidavit statements were corrected and supplemented with additional information, (2) probable cause did not dissipate prior to Plaintiff's initial arrest on April 23, 2015, and (3) Plaintiff's continued confinement after May 18, 2015 was upon Plaintiff's consent and therefore any misconduct by WCDOH Defendants in their order to show cause submission was not the proximate cause of his confinement. Accordingly, WCDOH Defendants' motion for summary judgment on Plaintiff's Section 1983 Fourth Amendment claim is granted.

## II.        Substantive Due Process Claim

To show a violation of substantive due process, a plaintiff must show that (a) he or she has a valid liberty or property interest, and (b) the defendant infringed on the liberty interest in an arbitrary or irrational manner. *Harlen Assocs. v. Vill. of Mineola*, 273 F.3d 494, 503 (2d Cir. 2001). Notably, substantive due process does not protect against every perceived infringement of valid liberty or property interests (even those that are incorrect or ill-advised), but rather only against those that are "arbitrary, conscience-shocking, or oppressive in a constitutional sense." *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995).

A "[s]ubstantive 'due process' analysis must begin with a careful description of the asserted right, for '[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.'"  *Reno v. Flores*, 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)).  Courts have recognized that "[a]s a substantive matter, due process does not permit the involuntary hospitalization of a person who is not a danger either to herself or to others."  *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995).

The parties do not dispute the existence of Plaintiff's liberty interest—*i.e.*, to be free from involuntary hospitalization absent a showing that he is dangerous.  Instead, WCDOH Defendants contend that Plaintiff's detention was not arbitrary and capricious because it was pursuant to a particularized assessment that Plaintiff was dangerous to others employing accepted medical standards and the use of detention was the least restrictive means available.  (WCDOH Moving Br. at 15-18.)  In opposition, Plaintiff relies upon the report of his expert Dr. George DiFerdinando (the "DiFerdinando Report") (ECF No. 143-45) to argue that Plaintiff's confinement was against established medical standards and was not the least restrictive means available to protect public health and safety.  (Pltf Opp. at 27-30.)

As a threshold matter, WMC Defendants argue that DiFerdinando Report—which Plaintiff contends sets forth a dispute of material facts as to the established medical standards—is inadmissible because it is unverified and without a supporting affidavit.  (WMC Reply at 2.)  This argument is not supported by Rule 56 of the Federal Rules of Civil Procedure after the 2010 amendment.

> Prior to its amendment in 2010, Rule 56 required that a sworn or certified copy of any document referred to in an affidavit be attached to the affidavit. Indeed, it was recognized that an exhibit could be used on a summary-judgment motion only if it were properly made

> part of an affidavit. Conversely, affidavits that purported to describe
> a document's substance or interpret its contents were insufficient.
> Further, to be admissible, documents had to be authenticated by and
> attached to an affidavit that met the requirements of Rule 56 and the
> affiant had to be a person through whom the exhibits could be
> admitted into evidence. However, when the rule was amended in
> 2010, the rulemakers omitted these specific requirements, and
> simply added to the list of appropriate materials 'documents.'

10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 2722 (4th ed.).

Accordingly, as there is no reasonable dispute as to whether Plaintiff's expert report is properly

before this Court, we analyze whether the DiFerdinando Report gives rise to disputed material

facts.

A.  *Plaintiff's Expert Report Does Not Raise a Dispute as to Generally Accepted
     Medical Standards for Involuntarily Committing (or Continuing to Commit) a
     Patient Suffering from Tuberculosis*

In determining whether an involuntary commitment comports with due process, the

plaintiff bears the burden of producing evidence, generally in the form of expert testimony,

regarding the "applicable medical standards and the defendant's alleged failure to meet those

standards." *Kraft v. City of New York*, 696 F. Supp. 2d 403, 413 (S.D.N.Y. 2010) (quoting *Fisk v.

Letterman*, 501 F. Supp. 2d 505, 522 (S.D.N.Y. 2007).  Expert testimony is required because such

determinations are generally outside a layperson's realm of knowledge and "turn [ ] on the meaning

of facts which [typically] must be interpreted by expert [medical professionals]." *Fisk*, 501 F.

Supp. 2d at 522 (quoting *Olivier v. Robert L. Yeager Mental Health Center*, 398 F.3d 183, 190–

91 (2d Cir. 2005)).

The DiFerdinando Report does not raise a genuine issue of material fact as to whether

Defendants failed to meet applicable medical standards with respect to the involuntary

confinement of Plaintiff because Dr. DiFerdinando fails to identify *any* standard generally

accepted in the medical community.  A review of the entire report and each of the conclusions of

Dr. DiFerdinando quoted by Plaintiff as relevant to this inquiry reveals that Dr. DiFerdinando never purports to define any generally accepted standard and that each of his conclusions were made without reference to an operative accepted medical standard.

For example, Dr. DiFerdinando opines that "the accrued positive behaviors of MC—seeking care, starting his regimen, adhering to care, providing sputum—should have been taken into account when assessing his overall state of care."  (ECF No. 143-45 at 6.)  But, Dr. DiFerdinando did not set forth what constitutes the applicable medical standard for evaluating whether a patient is a source of danger to others – *e.g.*, whether it is generally accepted in the medical community to, pre-hospitalization, evaluate a certain set of patient characteristics and how to evaluate those characteristics.  Accordingly, DiFerdinando's statement regarding the need to interpret Plaintiff's "accrued positive behaviors" is either: (i) agnostic as to whether WCDOH Defendants breached accepted medical standards—*i.e.*, Dr. DiFerdinando merely opines that in his personal judgment (separate from accepted medical standards) Plaintiff's accrued positive behavior should have been consulted—or, (ii) lacking a proper foundation to support a conclusion that WCDOH Defendants breached accepted medical standards.

Similarly, Dr. DiFerdinando concludes that "the decision to proceed with hospitalization on April 23 was an overreaction and not appropriate."  (ECF No. 143-45 at 7.)  Dr. DiFerdinando concludes that the commitment decision was an overreaction because the available clinical information indicated that Plaintiff adhered to Dr. Cooke's treatment.  (*See* ECF No. 143-45 at 6-8.)  But, Dr. DiFerdinando never sets forth what constitutes the generally accepted medical standard for the involuntary commitment of a person suffering from TB.  Accordingly, his conclusion that the decision to proceed with hospitalization was not appropriate "cannot be read to express any more than simply his personal disagreement with the [Defendants'] treatment

decisions." *Algarin v. New York City Dep't of Correction*, 460 F. Supp. 2d 469, 477 (S.D.N.Y. 2006), *aff'd*, 267 F. App'x 24 (2d Cir. 2008).

Likewise, Dr. DiFerdinando opines that "[g]iven the lack of any positive cultures, MC's adherence to an inpatient regime of DOT, his repeated negative smears, his clinical improvement, and his overall acceptance of his diagnosis and need for treatment, I believe he could and should have been discharged far soon (though, as stated previously, I do not think hospitalization was necessary at all)." (ECF No. 143-45 at 9.) But, at the risk of being repetitive, Dr. DiFerdinando never states what constitutes generally accepted medical standards with respect to the continued involuntary confinement of a patient. It would be a different story if Dr. DiFerdinando set forth his opinion that the generally accepted medical standard is to discharge a patient if they demonstrate particular signs of clinical improvement, adherence to a treatment plan, and testing reveals diminished or no signs of infectious disease present in the patient. The absence of such a benchmark is dispositive here.

The Court notes that it has serious reservations as to whether the analytical framework established in *Rodriguez*—which appears to have informed the manner in which the parties approached discovery and dispositive motion practice in this case—is appropriately applied in the context of involuntary commitments pursuant to PHL § 2120. The actions of public health officials in seeking a court ordered involuntary hospitalization pursuant to PHL § 2120 are clearly distinguishable from the actions of physicians instituting an involuntary hospitalization pursuant to New York's Mental Hygiene Law in certain ways that seem central to the framework set forth in *Rodriguez*. For example, the holding of *Rodriguez*—*i.e.*, that a physician's determination of a patient's dangerousness can violate substantive due process—is tied to a statutory regime where detention is authorized by a physician:

> Implicit in § 9.39's requirement that the decision be made by a
> physician is the premise that the decision will be made in
> accordance with the standards of the medical profession. Though
> committing physicians are not expected to be omniscient, **the
> statute implicitly requires that their judgment**—affecting
> whether an individual is to be summarily deprived of her liberty—
> **be exercised on the basis of substantive and procedural criteria
> that are not substantially below the standards generally
> accepted in the medical community**.

72 F.3d 1051, 1063 (2d Cir. 1995) (emphasis added).

By contrast, PHL § 2120—*i.e.*, the statutory regime authorizing Plaintiff's involuntary civil

confinement—does not outsource the authority to detain individuals to physicians nor does it

implicitly rely upon the physician's exercise of sound clinical judgment.  Instead, the express text

of PHL § 2120 only permits an involuntary hospitalization upon a finding by a court "after due

notice and a hearing . . . that the afflicted person is a source of danger to others."  The WCDOH

Defendants' statutory role in Plaintiff's confinement was to present evidence to a court enabling

that court to determine whether the individual was sufficiently dangerous as to warrant involuntary

hospitalization.

After *Rodriguez*, decisions in this Circuit suggest that a substantive due process claim

based upon involuntary commitment "should be limited to the hospital setting—thus preventing

substantive due process claims against law enforcement officers who bring a person into a

hospital."  *Matthews v. City of New York*, No. 15-CV-2311 (ALC), 2016 WL 5793414, at *6

(S.D.N.Y. Sept. 30, 2016).  Likewise, the Second Circuit has recently expressed skepticism with

the notion that the civil commitment line of cases—*e.g.*, *Rodriguez*—apply in the infectious

disease context. *Liberian Cmty. Ass'n of Connecticut v. Lamont*, 970 F.3d 174, 188 (2d Cir. 2020)

(noting that "only one decision [] has applied the civil commitment line of cases in the infectious

disease context.").

In any event, as discussed later in this Opinion, the apparent lack of certainty in decisional law with respect to how to analyze a deprivation of liberty occasioned by government measures to control the spread of infectious disease is certainly relevant to the WCDOH Defendants' assertion of qualified immunity.

B.    *There is a dispute as to whether WCDOH Defendants employed the least restrictive means possible.*

Plaintiff separately argues that summary judgment cannot be granted because there is a factual dispute as to whether Defendants employed the least restrictive means possible by seeking, or continuing, to confine him rather than employing less intrusive means of treatment or containment, *e.g.*, court-ordered DOT.  (Pltf Opp. at 29-30.)  Defendants respond that there was no less restrictive means of advancing government's interest in preventing the spread of tuberculosis because "Plaintiff was non-compliant with his medical treatment, remained in the community at large, and resided with other people, including three children, one of whom was ultimately infected with TB."  (WCDOH Reply at 8.)

The Supreme Court has established that even where the government has a legitimate purpose "that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved."  *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S. Ct. 247, 252, 5 L. Ed. 2d 231 (1960).  Although *Shelton* formally established the less restrictive means analysis as a consideration in substantive due process cases, the Court has not subsequently had occasion to apply the test in the context of civil confinement cases.  Other courts have viewed the less restrictive means analysis to be applicable in the context of confinement cases.  *See, e.g.*, *Lynch v. Baxley*, 744 F.2d 1452, 1459 (11th Cir. 1984) (collecting cases).  In any event, Defendants do not dispute the applicability of the less restrictive means analysis.

Relative to involuntary confinement, "less restrictive alternatives exist for TB control, including 'free treatment at neighborhood chest clinics, voluntary hospitalization, voluntary [directly observed therapy programs], and finally compulsory [directly observed therapy programs], the latter being the most coercive form of intervention short of detention.'" *Best v. St. Vincents Hosp.*, No. 03 CV.0365, 2003 WL 21518829, at *8 (S.D.N.Y. July 2, 2003), adopted by 2003 WL 21767656, *aff'd in relevant part sub nom. Best v. Bellevue Hosp.*, 115 F. App'x 459 (2d Cir. 2004).  The Second Circuit has previously stated, albeit in a non-precedential decision, that, with respect to the involuntary commitment of a TB patient authorized pursuant to New York City's analogous public health laws, allegations that the TB patient "did not refuse to take medication when he was initially detained," was not homeless, and did not plan "to leave New York immediately upon release" were sufficient to set forth a facially valid claim for violations of his substantive due process rights.  *Best v. Bellevue Hosp. New York*, NY, 115 F. App'x 459, 461 (2d Cir. 2004).

As discussed in great detail elsewhere in this Opinion, the March 4 Order authorizing the involuntary commitment of Plaintiff was supported by probable cause based upon the information available to WCDOH Defendants which established the presence of certain indicia of dangerousness.  Courts have previously held that the existence of probable cause to initiate an arrest is fatal to a claim that substantive due process was violated by that arrest.  *See, e.g.*, *United States v. McDermott*, 918 F.2d 319, 325 (2d Cir. 1990) ("Due process requires probable cause for an arrest, and when police officers acting in bad faith make an arrest without probable cause, the person arrested has suffered a deprivation of liberty without due process of law."); *Puller v. Baca*, 781 F.3d 1190, 1197 (10th Cir. 2015); *Anderson v. Larson*, 327 F.3d 762, 769–70 (8th Cir. 2003; *McIntosh v. City of New York*, No. 14CV00051FBST, 2017 WL 473840, at *5 (E.D.N.Y. Feb. 3,

2017), aff'd, 722 F. App'x 42 (2d Cir. 2018) (*citing Jimenez v. City of New York*, No. 14-cv-2994 (SAS), 2015 WL 5638041, at *7 (S.D.N.Y. Sept. 24, 2015)); *Pierre v. City of New York*, No. 05CV5018(JFB)(KAM), 2007 WL 2403573, at *13 (E.D.N.Y. Aug. 17, 2007) ("as the Court finds that Officer Hachadoorian and Sgt. White had probable cause to arrest plaintiffs, summary judgment as to plaintiffs' due process claims is granted."); *Clark v. Dowty*, 05–CV 1345, 2007 U.S. Dist. LEXIS 49184, at *18, 2007 WL 2022045 (D. Conn. July 9, 2007) ("Because the Court has already found that probable cause existed for the arrest of plaintiff, there was no violation of his substantive or procedural due process rights regarding this claim."); *Little v. City of New York*, 487 F. Supp. 2d 426, 442–43 (S.D.N.Y. 2007) ("[N]o reasonable juror could conclude that [defendant] deprived plaintiff of his liberty without due process because . . . [defendant] had probable cause for the arrest.").  Given the existence of probable cause supporting Plaintiff's arrest, Plaintiff cannot reasonably dispute whether *his initial commitment* was the least restrictive means possible or, stated differently, the least restrictive means test is insufficient to establish a substantive due process violation in connection with an arrest supported by probable cause.

Notwithstanding that holding, the fact that Plaintiff's initial involuntary hospitalization was supported by probable cause does not end the inquiry as to whether the *length of time* Plaintiff was involuntary hospitalized reflected the least restrictive means possible.  There are undisputed facts upon which a reasonable jury could clearly find that Plaintiff was compliant with his treatment both during the period in which he was treated by Dr. Cooke prior to his detention, and during his confinement at WMC.  Among other things, there is no reasonable dispute that Plaintiff was compliant with taking his anti-TB medications for extended periods of time during his confinement.  *See e.g.*, Pltf. Counter R.56.1 Statement ¶ 167 n.1 (citing ECF No. 143-12 (containing notes maintained by WMC confirming Plaintiff's compliance with his medication

regimen).)  Plaintiff raises triable issues pursuant to *Best v. Bellevue Hosp. New York* as to whether Plaintiff's continued confinement, after he had complied with ingesting anti-TB medication, violated Plaintiff's substantive due process rights.

Accordingly, this Court would be inclined to deny WCDOH Defendants' motion for summary judgment on Plaintiff's Section 1983 substantive due process claim if Plaintiff asserted a clearly established right.  However, as discussed further below, the Court holds that WCDOH Defendants are entitled to qualified immunity with respect to Plaintiff's substantive due process claim based on the Second Circuit's recent holding in *Liberian Cmty. Ass'n of Connecticut v. Lamont*, 970 F.3d 174 (2d Cir. 2020).

## III.      First Amendment Retaliation Claim

"To defeat summary judgment on his First Amendment retaliation claim," a plaintiff is "required to provide evidence that (1) his speech was constitutionally protected, (2) [an official] took an adverse action against him, and (3) there was a causal relationship between the protected speech and the adverse action." *Williams v. Temple*, 349 F. App'x 594, 596 (2d Cir. 2009) (citing *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003)).  There is no dispute that Plaintiff's speech— *i.e.*, commencing a lawsuit against public officials—is constitutionally protected or that the initiation of an application to extend Plaintiff's confinement could constitute an adverse action against Plaintiff.  Instead, WCDOH Defendants seek summary judgment on Plaintiff's First Amendment retaliation claim on the basis that Plaintiff has purportedly failed to produce any competent evidence beyond conclusory statements in support of the position that there is a causal connection between Plaintiff's protected speech and WCDOH Defendants' adverse action towards Plaintiff.  Plaintiff argues that his retaliation claim survives a motion for summary judgment because he has established circumstantial and direct evidence that WCDOH Defendants sought to extend his confinement as a result of his filing of a notice of claim against them.  The Court agrees.

"A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action," *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (citation omitted), and generally, "[t]emporal proximity is strong circumstantial evidence of improper intent," *Anderson v. State of New York, Office of Court Admin.*, 614 F. Supp. 2d 404, 430 (S.D.N.Y. 2009). The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Id.* "[D]irect evidence of retaliation may consist of 'conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged retaliatory attitude.'" *McAvey v. Orange–Ulster BOCES*, 805 F. Supp. 2d 30, 40 (S.D.N.Y. 2011) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 913 (2d Cir. 1997) (brackets omitted)).

Plaintiff argues that discovery has produced circumstantial evidence that Plaintiff's continued confinement was a result of his filing of a notice of claim. He emphasizes the temporal proximity between Plaintiff's filing of the notice of claim—which WCDOH Defendants learned on April 24, 2015—and WCDOH Defendants' application to Justice Adler seeking to extend his confinement on May 18, 2015. (Pltf Opp. at 31.) Plaintiff also point to direct evidence of retaliation including that, in advance of the hearing on WCDOH Defendants' application to extend Plaintiff's confinement on June 18, 2015, the WCDOH, through counsel, stated that it was "willing to allow" Plaintiff to leave WMC if, among other things, he provided "an executed release" of his civil claims. (Pltf. Opp. at 33.)

If the temporal connection between the filing of his notice of claim and WCDOH Defendants' pursuit of an order extending his confinement "represented the sum total of [Plaintiff's] proof, we might be inclined to . . . grant [] summary judgment based on the weakness

of [Plaintiff's] case." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). However, there is also evidence that WCDOH Defendants expressly conditioned their willingness to discharge Plaintiff upon his release of claims against them during discussions that occurred while he was still detained. Considering both the direct and circumstantial evidence, the Court concludes that there is a triable dispute as to whether WCDOH Defendants' continued confinement of Plaintiff was caused by Plaintiff's filing of a notice of claim.

Accordingly, WCDOH Defendants' motion for summary judgment on Plaintiff's First Amendment retaliation claim is denied.

## IV.      Qualified Immunity

WCDOH Defendants contend that they are entitled to qualified immunity as to each of Plaintiff's federal claims. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S. Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ("Government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow*, 457 U.S. at 818–19.

A defendant enjoys qualified immunity if he can show that "either (a) [his] action did not violate clearly established law, or (b) it was objectively reasonable for [him] to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (internal quotation marks and citations omitted). "A right is 'clearly established'

when '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013); *accord Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The Court must consider "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support[s] the existence of the right in question; and (3) whether under preexisting law a reasonable official would have understood that his or her acts were unlawful." *Burns v. Citarella*, 443 F. Supp. 2d 464, 470 (S.D.N.Y. 2006) (*citing Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991)).

A.       *Whether Rights Were Clearly Established at Time of Challenged Conduct*

Exercising its discretion, the Court first addresses the existence of clearly established rights underlying Plaintiff's claims. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

After the motions for summary judgment were fully briefed, in *Liberian Community Association of Connecticut v. Lamont*, the Second Circuit extensively analyzed case law concerning the use of quarantines as a public health safety measure in the face of infectious disease, and reached the conclusion that defendants in that case were entitled to qualified immunity because the substantive rights of people quarantined in connection with infectious disease control are not clearly established.  970 F.3d 174, 191 (2d Cir. 2020).  In that case, plaintiffs were subjected to, or at risk of being subjected to, home confinement for up to three weeks (*i.e.*, the longest possible incubation period for Ebola virus) by declaration of the State of Connecticut, even though this measure was more stringent than guidelines promulgated by the Center for Disease Control.  *Id.* at 178-182.  Plaintiffs argued that the imposition of this quarantine violated their substantive due process rights because "quarantines—a form of civil detention—implicate fundamental liberty interests, existing law clearly establishes that officials may impose them only when necessary to

48

achieve a compelling state interest and in the absence of less restrictive means." *Id.* at 187.  The

Second Circuit rejected this argument and held that "the due process standards articulated in *Jones*

[*v. United States*, 463 U.S. 354 (1983)], as in *Project Release* [*v. Prevost*, 722 F.2d 960 (2d Cir.

1983)], concern civil commitment **of the mentally ill**.  Taking a generalized statement like that

found in *Project Release* or *Jones* as evidence of a 'clearly established rule' in the context of

quarantines conflicts with the Supreme Court's directive that we should not 'define clearly

established law at a high level of generality.'" *Id.* at 188 (emphasis added).  Defendants in that

case were entitled to qualified immunity because "[n]either civil commitment law nor other

infectious disease cases had clearly articulated the substantive due process standard Appellants

urge should have governed [defendant's] actions." *Id.* at 191.

Plaintiff's deprivation of liberty is distinguishable from both the quarantines imposed in

*Liberian Community Association of Connecticut—i.e.*, Plaintiff was involuntary hospitalized

rather than ordered to engage in home quarantine—and the hospitalizations analyzed in cases such

as *Project Release* and *Jones—i.e.*, Plaintiff was hospitalized based upon his contraction of an

infectious disease rather than his mental health.  Nonetheless, the Court is convinced, based upon

*Liberian Community Association of Connecticut*, that it would be inappropriate to infer a clearly

established rule in the context of hospitalization for infectious disease control based upon caselaw

concerning civil commitment for mental illness.  As the Second Circuit noted, the two district court

cases in this Circuit that previously analyzed involuntary hospitalizations for disease control

employed distinct standards.  *Compare Best*, 2003 WL 21518829, at *8 (applying least restrictive

means test to analyze involuntary hospitalization of person infected with tuberculosis) *with United

States ex rel. Siegel v. Shinnick*, 219 F. Supp. 789, 790–91 (E.D.N.Y. 1963) (upholding the

decision to isolate a woman who arrived in the United States from a region infected with smallpox

for the entire incubation period of the disease as "reached in obvious good faith" after "forthright, reasoned and circumstantially reassuring" consideration).  The use of different analyses further "'demonstrates that the law on the point [was] not well established.'"  *Liberian Cmty. Ass'n of Connecticut*, 970 F.3d at 191 (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1868, 198 L. Ed. 2d 290 (2017)).  Accordingly, WCDOH Defendants are entitled to summary judgment as to Plaintiff's substantive due process claim.

Similarly, and as an alternative ground for granting summary judgment in favor of WCDOH Defendants with respect to Plaintiff's Fourth Amendment claim, the Court finds that WCDOH Defendants' arrest of Plaintiff on April 23, 2015 and his continued detention thereafter did not violate a clearly established right to the extent it is predicated upon the dissipation of probable cause.  While courts have recognized that probable cause can dissipate over time, the Second Circuit has not directly addressed whether an officer can be liable for false imprisonment, false arrest, or unlawful seizure if, after a lawful warrant is issued, probable cause dissipates prior to the subject's arrest, nor whether "an officer can be liable for false imprisonment if, after a lawful arrest, probable cause dissipates and the suspect is not released from custody."  *Walker v. City of New York*, No. 15 CV 500, 2017 WL 2799159, at *5 n.5 (E.D.N.Y. June 27, 2017).  *See also United States v. Pabon*, 871 F.3d 164, 177 (2d Cir. 2017) (finding it unnecessary to decide whether an officer may, in an extreme case, be required to release a detainee arrested without a warrant where probable cause has unequivocally dissipated, rendering further detention unreasonable); *Berrio v. City of New York*, No. 15-cv-9570, 2019 WL 1437585, at *7 n.7 (S.D.N.Y. Mar. 29, 2019) ("Plaintiff provides no legal authority to support the conclusion that she can maintain a claim for false imprisonment, or failure to intervene, for the time she was held after probable cause

dissipated").   Thus, no "clearly established" right has been identified here with respect to Plaintiff's prolonged detention claims.

By contrast, WCDOH Defendants do not make any argument upon which the Court could conclude that Plaintiff's retaliation claim is predicated upon a right that was not clearly established. Nor could WCDOH Defendants persuasively make such an argument because Plaintiff's right to seek judicial relief from WCDOH Defendants' actions is well established under the First Amendment.   *See, e.g.*, *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002) ("The rights to complain to public officials and to seek administrative and judicial relief from their actions are protected by the First Amendment.") (citing *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988); *United Mine Workers v. Illinois State Bar Ass'n.*, 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967).

       *B.*     *Whether Defendants' Conduct Violated a Clearly Established Right.*

Plaintiff's only federal claim for which he has asserted a clearly established right is his First Amendment retaliation claim.   As discussed above, Plaintiff's claim sufficiently asserts circumstantial and direct evidence supporting each element of Plaintiff's retaliation claim. Accordingly, WCDOH Defendants are not entitled to qualified immunity.

*    *    *

The Court holds that WCDOH Defendants are entitled to qualified immunity with respect to Plaintiff's Fourth Amendment unlawful seizure claim and Plaintiff's substantive due process claim, but that WCDOH Defendants are not entitled to qualified immunity with respect to Plaintiff's First Amendment retaliation claim.   Accordingly, summary judgment is granted to WCDOH Defendants with respect to Plaintiff's Section 1983 Fourth Amendment and substantive due process claims and denied with respect to Plaintiff's Section 1983 First Amendment retaliation claim.

## V.        False Imprisonment

A claim for false arrest brought under *Bivens* or New York law requires proof that: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Jocks v. Tavernier*, 316 F.3d 128, 134–35 (2d Cir. 2003). The confinement is "otherwise privileged" if probable cause exists at the time of the arrest. *Id.* at 135; *Henning v. City of New York*, No. 09–CV–3998, 2012 WL 2700505, at *4 (E.D.N.Y. July 5, 2012). Therefore, the existence of probable cause "is an absolute defense to a false arrest claim." *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006); *Evans v. Solomon*, 681 F. Supp. 2d 233, 241 (E.D.N.Y. 2010). *See also Johnson v. City of New York*, 2006 WL 2354815, at *3 (S.D.N.Y. Aug.14, 2006) ("a false arrest claim fails if the underlying detention occurred during a search pursuant to a warrant predicated on probable cause." (citing *Michigan v. Summers*, 452 U.S. 692, 705, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981)); *Ben-Zaken v. City of New Rochelle*, 273 A.D.2d 426, 427, 710 N.Y.S.2d 106, 107 (1st Dept. 2000) ("A cause of action alleging false imprisonment does not lie where, as here, the defendants can establish the existence of probable cause for the plaintiff's arrest.")

As discussed at length above, the Court finds that Plaintiff's confinement was supported by probable cause and that Plaintiff's continued confinement after May 23, 2015 was obtained on Plaintiff's consent. As such, there can be no genuine dispute of material fact that Plaintiff's false imprisonment claim fails because his confinement was privileged and, in part, upon consent. Accordingly, Defendants' motions for summary judgment are granted with respect to Plaintiff's false imprisonment claim.

## VI.       Malicious Prosecution

"Probable cause to believe that a person committed a crime is a complete defense to claims of . . . malicious prosecution[.]" *Batten v. City of New York*, 133 A.D.3d 803, 805, 20 N.Y.S.3d

160, 162–63 (2d Dept. 2015) (quoting *Fortunato v. City of New York*, 63 A.D.3d 880, 880, 882 N.Y.S.2d 195 (2d Dept. 2009); *see also Bratge v. Simons*, 173 A.D.3d 1623, 1624, 102 N.Y.S.3d 818, 820 (4th Dept. 2019); *Broyles v. Town of Evans*, 147 A.D.3d 1496, 1496, 47 N.Y.S.3d 605 (4th Dept. 2017); *Kirchner v. County of Niagara*, 153 A.D.3d 1572, 1573, 61 N.Y.S.3d 406 (4th Dept. 2017). As discussed at length above, the Court finds that Plaintiff's confinement was supported by probable cause, that probable cause did not dissipate, and that Plaintiff's continued confinement after May 23, 2015 was obtained on Plaintiff's consent. Accordingly, Defendants' motions for summary judgment are granted with respect to Plaintiff's malicious prosecution claim.

## VII.        Abuse of Process Claims

"In New York, a malicious abuse of process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994). As discussed below, Plaintiff's abuse of process claim fails, to the extent it is predicated upon either WCDOH Defendants' initial application to Justice Adler seeking his detention, or WCDOH Defendants' role in his initial arrest, because, given the presence of probable cause, WCDOH Defendants' use of process is justified. However, to the extent Plaintiff's claim against WCDOH Defendants is predicated upon WCDOH Defendants' application to extend his confinement on May 18, 2015, the Court finds that there is a triable issue as to whether WCDOH Defendants were motivated by a collateral objective—*i.e.*, to leverage Plaintiff into dropping his claims. Plaintiff's claim fails as against WMC Defendants because they did not issue, employ, or participate in, any legal process.

A.      *WCDOH Defendants*

WCDOH Defendants argues that the existence of probable cause is a complete defense to an abuse of process claim.  (WCDOH Moving Br. at 22.)  In his opposition papers, Plaintiff does not directly address whether probable cause is a complete defense to an abuse of process claim but asserts, among other things that, "just as a jury could find that Defendants were motivated by retaliatory animus . . . there is more than adequate evidence on which a jury could rely to find that Defendants pursued and continued Plaintiff's confinement because of an improper collateral objective: avoiding civil liability."  (Pltf Opp. at 40.)

WCDOH Defendants cite *Granato v. City of New York* for the position that, while probable cause is not an element of an abuse of process claim, "a showing of probable cause at the time process issued suffices also to establish 'excuse or justification' for the purposes of a defense to abuse of process."  No. 98-CV-667 (ILG), 1999 WL 1129611, at *7 (E.D.N.Y. Oct. 18, 1999) (citing *Berman v. Silver, Forrester & Schisano*, 156 A.D.2d 624, 625, 549 N.Y.S.2d 125, 127 (2d Dept. 1989).  Besides the cases cited by Plaintiff, numerous other courts in this Circuit have held that probable cause is a complete defense to an abuse of process claim.  *See, e.g.*, *Jones v. J.C. Penny's Dept. Stores, Inc.*, 317 F. App'x 71, 74 (2d Cir. 2009) ("The conclusion that Jones could not prevail on her claims that the officers lacked probable cause for her arrest or that they discriminated against her based on her race required dismissal of her state and federal claims of abuse of process."); *Savino v. City of New York*, 331 F.3d 63, 77 (2d Cir. 2003) (overturning denial of summary judgment where district court "erred in relying on a lack of probable cause to infer that, in securing Savino's arrest, defendants acted with malice or with a collateral objective that was outside the legitimate ends of the legal process."); *McIntosh v. City of New York*, No. 14CV00051FBST, 2017 WL 473840, at *5 (E.D.N.Y. Feb. 3, 2017) (granting summary judgment as to substantive due process claim "[b]ecause there was probable cause for plaintiff's arrest."),

aff'd, 722 F. App'x 42 (2d Cir. 2018); *Irish v. The City of New York*, No. 09 CIV.5568(RMB), 2010 WL 5065896, at *6 (S.D.N.Y. Dec. 6, 2010) ("Defendants argue persuasively that Plaintiff cannot establish the essential elements of an abuse of process claim because 'there was probable cause to prosecute [P]laintiff for robbery and grand larceny.'" (citing *Sforza v. City of New York*, No. 07 Civ. 6122, 2009 U.S. Dist. LEXIS 27358, at *49–50, 2009 WL 857496 (S.D.N.Y. Mar. 31, 2009)); *Pierre v. City of New York*, 05–CV–5018 (JFB)(KAM), 2007 WL 2403573, at *12 (E.D.N.Y. Aug. 17, 2007) (holding, in the alternative, that summary judgment was warranted on abuse of process claim because defendants established probable cause to prosecute plaintiffs); *Golden v. City of New York*, 418 F. Supp. 2d 226, 235 (E.D.N.Y. 2006) ("Since I have concluded that there was probable cause for plaintiff's arrest and prosecution, defendants had an excuse and justification for employing regularly issued process."); *DeVito v. Barrant*, 03–CV–1927 (DLI)(RLM), 2005 WL 2033722, at *9 (E.D.N.Y. Aug. 23, 2005) ("the existence of probable cause, which the court has found as a matter of law, bars plaintiff's abuse of process claim"); *Almonte v. City of New York*, 03–CV–5078 (ARR), 2005 WL 1229739, at *5 (E.D.N.Y. May 20, 2005) ("The existence of probable cause offers a complete defense to a claim of abuse of process."); *Hickey v. City of N.Y.*, No. 01 Civ. 6506(GEL), 2004 WL 2724079, at *7 (S.D.N.Y. Nov. 29, 2004) (concluding that probable cause offers a complete defense to an abuse of process claim).

The Court agrees that the existence of probable cause *at the time the process* is issued constitutes a complete defense to a claim of abuse of process under New York law.  Accordingly, Plaintiff's abuse of process claim does not survive a motion for summary judgment to the extent it is predicated upon WCDOH Defendants' conduct in seeking his initial confinement, *i.e.*, obtaining the order authorizing his confinement, or participating in his arrest on April 23, 2015.

Nonetheless, the Court reaches a different conclusion with respect to WCDOH Defendants' conduct in connection with the order to show cause process after May 18, 2015.  The fact that probable cause supported the initial arrest is irrelevant as to whether WCDOH Defendants' subsequent conduct was justified, and this Court separately held that there was sufficient evidence for Plaintiff's First Amendment retaliation claim to survive a motion for summary judgment.  The conduct relevant to Plaintiff's retaliation claim—*i.e.*, WCDOH Defendants' alleged improper motive for seeking to continue to confine Plaintiff—is equally dispositive here.  As a reasonable jury could conclude that WCDOH Defendants retaliated against Plaintiff in seeking to extend his confinement, it follows that a reasonable jury could conclude that WCDOH Defendants order to show cause application was in pursuit of a collateral objective – *i.e.*, to leverage Plaintiff into dropping his pursuit of litigation against WCDOH Defendants.   Accordingly, WCDOH Defendants' motion for summary judgment is debued with respect to Plaintiff's abuse of process claim.

   B.   *WMC Defendants*

   By contrast, the Court finds that Plaintiff's claim for abuse of process should be dismissed as against WMC Defendants because they did not employ or facilitate any legal process.  WMC Defendants argue, among other things, that a grant of summary judgment in its favor is proper because there is no dispute that WMC did not submit any supporting affidavits or other documents in support of the application to extend Plaintiff's proceedings, and thus it did not employ regularly issued legal process to compel performance or forbearance of some act.  There is no allegation that WMC Defendants participated in, or prompted the initiation of, any court proceedings.  Instead, Plaintiff contends that WMC either had an obligation to submit exculpatory materials to the Court or that they participated in a legal process because they possessed discretion to discharge Plaintiff

under PHL § 2123.  (*See* Pltf Opp. at 39 (arguing that WMC's "affirmative decision to continue and prolong Plaintiff's confinement constitutes the employment of legal process.").)

In support of its position, Plaintiff cites *Ramos v. City of New York*, 285 A.D.2d 284, 289, 729 N.Y.S.2d 678 (1st Dept. 2001).  *Ramos* held that a civil defendant that was not a litigant in the underlying proceeding can still be the cause injuries in the context of a malicious prosecution claim where they fail "to make a full and complete statement of the facts to the District Attorney or the court, or hold[] back information that might have affected the results, with that defendant's initiation of a malicious prosecution." *Id.* at 289.  However, in *Ramos*, defendant New York City Department of Social Services' Human Resources Administration had "an agreement under which HRA referred claims of sexual abuse of day care center children to the District Attorney" and submitted a referral for prosecution to the district attorney that omitted exculpatory information. *Id.* at 288.

As this Court has previously discussed, with respect to claims like the one envisioned in *Ramos*, a defendant's provision of information, or withholding of information, is only capable of satisfying the "issuance of legal process" element of a malicious process claim if it was done in order to facilitate or effect the underlying prosecution.  *Moritz v. Town of Warwick*, No. 15-CV-5424 (NSR), 2016 WL 3248494, at \*5 (S.D.N.Y. June 9, 2016) ("In order to be found to have issued process, a defendant must have **promoted or facilitated the prosecution** . . . The intentional provision of false information regarding a plaintiff's crimes **to cause a plaintiff's false arrest** 'is sufficient to constitute issuance of process.'" (emphasis added) (citations omitted)).

WMC Defendants are not alleged to have promoted or facilitated the order to show cause application in order to extend Plaintiff's detention.  Instead, they are alleged to have not sufficiently participated in the legal process by failing to provide exculpatory information to

Justice Adler once WCDOH Defendants sought an order to show cause.  Plaintiff could sustain a claim against WMC Defendants if it were alleged that WMC Defendants prompted WCDOH Defendants to seek the order to show cause and failed to provide exculpatory information to the WCDOH Defendants in making the referral.  But there is no such allegation here.

To the extent Plaintiff argues that WMC Defendants failure to discharge Plaintiff despite their discretionary authority to do so pursuant to PHL § 2123 constitutes the employment of regularly issued legal process, the Court disagrees.  Abuse of process has been described as an obscure tort "which is rarely brought to the attention of the courts . .  and the vital elements of which are not clearly defined."  *Gratton v. Vadney*, 55 Misc. 3d 1208(A), 57 N.Y.S.3d 675 (N.Y. Sup. Ct. Essex County, 2017) (quotation marks and citation omitted).  Nonetheless, the Court is satisfied that, ill-defined though the tort may be, the failure to exercise discretionary authority to discharge a patient pursuant to PHL § 2123 "cannot be regarded as process for it is not a 'direction or demand that the person to whom it is directed . . . perform or refrain from the doing of some prescribed act.'"  *Julian J. Studley, Inc. v. Lefrak*, 41 N.Y.2d 881, 884, 362 N.E.2d 611, 613, 393 N.Y.S.2d 980, 982 (1977) (quoting *Williams v Williams*, 23 NY2d 592, 596 (1969).

Accordingly, WMC Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's abuse of process claim.

## VIII.        Immunity Under State Law

WCDOH Defendants makes the conclusory argument that "the individually-named County Defendants are protected from suit in the present matter [with respect to all state law claims] pursuant to New York Public Health Law § 329(1)," which states that, "[n]o health officer, inspector, investigator, public health nurse, or other representative of a health officer, and no person or persons other than the county, city, village or town by which such health officer or representative thereof is employed shall be sued or held to liability for any act done or omitted by

any such health officer or representative of a health officer in good faith and with ordinary discretion on behalf or under the direction of such county, city, village or town pursuant to its regulations or ordinances, or the sanitary code, or this chapter."

Plaintiff argues in response that WCDOH Defendants cannot assert immunity from conduct that is actionable under Section 1983 based on state law. (Pltf Opp. at 34.) The Court agrees to the extent that Plaintiff is arguing that PHL § 329 does not control WCDOH Defendants' immunity from claims arising under federal law. The Court disagrees to the extent that Plaintiff argues that PHL § 329 is incapable of providing a defense as to state law claims. *Martinez v. State of Cal.*, 444 U.S. 277, 283, 100 S. Ct. 553, 558, 62 L. Ed. 2d 481 (1980) ("We therefore find no merit in the contention that the State's immunity statute is unconstitutional when applied to defeat a tort claim arising under state law."). Plaintiff has not clearly invited this Court to pass judgment on whether PHL § 329's facial grant of immunity as to state law claims should be deemed unconstitutional and the Court does not take a view on that argument at this stage of the litigation.

Plaintiff also argues that, even if the statute could apply, summary judgment is inappropriate because PHL § 329 only shields acts "done or omitted . . . in good faith with ordinary discretion," and that, Plaintiff has adduced ample evidence that the WCDOH Defendants acted in bad faith and beyond the outer bounds of appropriate professional discretion. (Pltf Opp. at 34.) As discussed in greater detail above, the Court concluded that there was a genuine dispute of material fact as to whether WCDOH Defendants acted in a retaliatory fashion when seeking to continue to Plaintiff's hospitalization. For the same reason, the Court cannot at this stage conclude that WCDOH Defendants acted in good faith and denies WCDOH Defendants' motion for summary judgment to the extent it is premised upon immunity pursuant to PHL § 329.

Plaintiff separately argued that WCDOH Defendants failed to assert PHL § 329 as an affirmative defense in their responsive pleadings and it is thus waived pursuant to Rule 8(c) of the Federal Rules of Civil Procedure. WCDOH Defendants respond that they asserted the affirmative defense of absolute immunity in their responsive pleadings and that accordingly it is not waived. Confusingly, WCDOH Defendants cite to an exhibit that merely contains Plaintiff's Amended Complaint. (WCDOH Reply at 10 (citing ECF No. 132-14 (WCDOH Ex. L) at § 62-64.) In any event, a review of WCDOH Defendants' Answer to the Amended Complaint reveals that it pleaded absolute immunity as an affirmative defense. (ECF No. 97 (WCDOH Defendants Answer) at 10 ¶ 62.)

Even assuming that WCDOH Defendants general assertion of "absolute immunity" was insufficient to effectively plead immunity pursuant to PHL § 329 as an affirmative defense, the Court declines to exercise its discretion to deem the defense waived. "It is well established in this Circuit that an affirmative defense may be asserted even at summary judgment where the party opposing the affirmative defense has the opportunity to respond effectively to that defense, and has otherwise suffered no prejudice as a result of its late pleading." *In re Livent, Inc. Noteholders Sec. Litig.*, 355 F. Supp. 2d 722, 727 (S.D.N.Y. 2005) (citing *Astor Holdings, Inc. v. Roski*, 325 F. Supp. 2d 251, 260–261 (S.D.N.Y. 2003); *DeVito v. Pension Plan of Local 819 I.B.T. Pension Fund*, 975 F. Supp. 258, 263 (S.D.N.Y. 1997)).

Plaintiff was not unfairly prejudiced by the late introduction of PHL § 329 as an affirmative defense because it is abundantly clear that Plaintiff is well prepared to oppose that defense with evidence he has obtained in discovery. As Plaintiff argues, the applicability of PHL § 329 turns on whether WCDOH Defendants acted in good faith. (Pltf. Opp. at 34.) In developing his case for liability pursuant to several of his claims, including his claim for malicious abuse of process,

Plaintiff sought and obtained evidence demonstrating potential bad faith conduct by the WCDOH

Defendants that, if accepted by a jury, could result in successful opposition to the affirmative

defense.

## IX.        Municipal Liability

WCDOH Defendants assert that "Plaintiff has not produced sufficient evidence to

withstand summary judgment with respect to his constitutional claims against the individual

defendants, thus his claims against Defendant the County of Westchester cannot survive."

(WCDOH Moving Br. at 23.)  In support of this position, WCDOH Defendants cite cases, such as

*Warheit v. City of New York*, 2006 WL 2381871 (S.D.N.Y. Aug. 15, 2006), setting forth the

standard for establishing *Monell* liability.  (WCDOH Opp. at 24.)

Plaintiff correctly responds that the County of Westchester is "sued only under *respondeat*

*superior* in connection with Plaintiff's state law claims" and that *Monell* does not govern state law

claims.  (Pltf. Opp. at 34-35 n.6.)  WCDOH Defendants seem to concede this point by failing to

respond to Plaintiff's argument in their reply papers.  In any event, WCDOH Defendants bare

recitation of standards relating to *Monell* liability does not present this Court with any basis to

grant summary judgment as to Defendant County of Westchester with respect to Plaintiff's state

law claims.

## X.        Plaintiff's Claims Against the John and Jane Doe Defendants

Plaintiff names in his Amended Complaint six John and Jane Doe Defendants that are

alleged to have been employees of the County of Westchester, WCDOH, and/or WMC.  (*See*

Amended Compl. (ECF No. 39) ¶ 12.)  WCDOH Defendants argued that "Plaintiff's claims against

the Jane/John Doe Defendants should be summarily dismissed" because "[d]iscovery is now

closed and Plaintiff [failed] to timely identify and serve Jane/John Doe Defendants."  (WCDOH

Moving Br. at 25.)  Plaintiff did not respond to this argument in his opposition papers, appears to

have only opposed summary judgment with respect to the WCDOH Defendants and WMC Defendants, and defined the WCDOH Defendants and WMC Defendants in his opposition papers to exclude the John and Jane Doe Defendants.  (*See* Pltf Opp. at 21 n. 3 & 36 n.7.)   It is quite conceivable that Plaintiff missed this argument because WCDOH Defendants buried it in a short paragraph within a section of their moving papers on an entirely unrelated argument.

While the Court disapproves of WCDOH Defendants' dispositive argument by ambush approach, dismissal without prejudice is nonetheless warranted.  *See, e.g.*, *Scott v. City of Mount Vernon*, No. 14-CV-4441 (KMK), 2017 WL 1194490, at *33 (S.D.N.Y. Mar. 30, 2017) ("Plaintiffs have made no attempt to amend their Complaint to include the real identities of those individuals. As discovery has now closed, the proper course is to dismiss the John Doe Defendants without prejudice."); *Sachs v. Cantwell*, No. 10 CIV. 1663 JPO, 2012 WL 3822220, at *10 (S.D.N.Y. Sept. 4, 2012); *Delrosario v. City of New York*, No. 07 Civ. 2027, 2010 WL 882990, at *5 (S.D.N.Y. Mar. 4, 2010); *Coward v. Town and Village of Harrison*, 665 F. Supp. 2d 281, 300–01 (S.D.N.Y. 2009); *Jeanty v. County of Orange*, 379 F. Supp. 2d 533, 536 n. 3 (S.D.N.Y. 2005). The operative events giving rise to this litigation occurred over five years ago, the action was initiated over four years ago, discovery has closed, and Plaintiff has made no apparent attempt to further amend his complaint to include the real identities of the John and Jane Doe Defendants.  It bears emphasizing that Plaintiff has taken discovery of the very entities which he alleges were the employers of the John and Jane Doe Defendants and has still come no closer to identifying the true identities of those parties.

Accordingly, the Court dismisses John Does # 1 – 3 and Jane Does # 1 – 3 from the case without prejudice for failure to prosecute.

## CONCLUSION

For the foregoing reasons, the Defendants' motions for summary judgment are GRANTED in part and DENIED in part.  Summary judgment is granted on all of Plaintiff's claims against Defendants Westchester Medical Center and Miral A. Subhani.  Summary judgment is granted on Plaintiff's Section 1983 Fourth Amendment and substantive due process claims, malicious prosecution claim, and false imprisonment claims against the WCDOH Defendants. All claims against John Does #1 – 3 and Jane Does # 1 – 3 are dismissed without prejudice.  Plaintiff's remaining claims are Section 1983 First Amendment retaliation and state law abuse of process against WCDOH Defendants.

The Clerk of the Court is respectfully directed to terminate the motions at ECF Nos. 132 and 133, enter judgment in favor of Defendants Westchester Medical Center and Miral A. Subhani, and remove Defendants Westchester Medical Center and Miral A. Subhani from the case caption. The remaining parties are directed to appear for a telephonic pre-trial conference on February 24, 2021 at 2:00 P.M.

To access the telephonic pre-trial conference, please follow these directions: (1) Dial the Meeting Number: (877) 336-1839; (2) Enter the Access Code: 1231334 #; (3) Press pound (#) to enter the conference as a guest.

Dated:   December 18, 2020                          SO ORDERED:
         White Plains, New York

                                                    NELSON S. ROMÁN
                                                    United States District Judge